TJOFLAT, Circuit Judge:
 

 This is an antitrust case involving non-price, vertical restraints on trade. The defendant, Itek Corporation (Itek), appeals from a jury verdict in favor of plaintiff Graphic Products Distributors, Inc., (GPD) in a suit brought under, inter alia, Section 1 of the Sherman Act, 15 U.S.C. § 1 (1976), and Section 4 of the Clayton Act, 15 U.S.C. § 15 (1976 & Supp. V 1981). Itek contends on appeal that the district court should have granted it a directed verdict or judgment notwithstanding the verdict (n.o.v.) because (1) the evidence was insufficient to establish that its distribution system was an unreasonable restraint of trade; and (2) the evidence was insufficient to establish the amount of GPD’s damages. It also contends that the district court should have granted it a new trial because the jury instructions misstated the applicable law. We affirm.
 

 
 *1564
 
 I.
 

 Although we conclude that the evidence was sufficient to create jury questions regarding both liability and damages, we do so not without some reluctance. The evi-dentiary record is neither as extensive nor as precise as one would expect in a well-tried antitrust case. Most important, the history of Itek and evidence of its need to utilize the challenged vertical restraints to compete in the marketplace were not fully presented to the district court.
 

 Itek’s Graphic Products Division manufactures graphic equipment and supplies for the national graphic arts market. Its product line includes offset platemaking machines (platemakers), duplicators, camera processors, and microfilm equipment.
 
 [1]
 
 Itek sells supplies to accompany these products, and provides the needed servicing as well. It had annual revenues of some $85,000,000 in 1977, the only year for which we have this data. Approximately one-third of those sales were in equipment, the rest in service and supplies. The record does not indicate what percentage of this revenue derived from each of Itek’s product lines.
 

 Prior to 1975, Itek distributed its equipment and supplies exclusively through its own sales organization. It had twenty-two direct sales or branch offices, concentrated in major urban areas with large potential markets. In order to increase sales in the areas outside those major urban centers already relatively well-covered by the branch offices, Itek decided to switch to a dual distribution system in the period 1975-76.
 

 Under this dual system, Itek confined its branch offices’ direct sales activity to within a 50-mile radius of the cities in which they were located. Using marketing areas designated by the Business Equipment Manufacturers Association (BEMA), Itek divided up the rest of the country and sought independent distributors for these remaining areas. BEMA areas assigned to a distributor did not overlap with those of any other distributor or any branch office. At the time of this litigation, there were approximately 30 such independent distributors.
 

 We emphasize that the record does not indicate the extent of Itek’s sales activities in the areas outside the major urban centers before or after the institution of the dual distribution system. The only evidence bearing on this point indicates that, prior to the implementation of the distributorship program, the branch office personnel would make infrequent trips to these areas. Nor does the record reveal the extent to which Itek’s competitors were selling in these secondary markets. ' We do know, however, that all of Itek’s previous efforts to appoint distributors had been with outside graphic equipment dealers. We do not know precisely what these existing graphic equipment dealers were selling, i.e., whether they were selling Itek-type products.
 

 Other than for the territory ultimately assigned to GPD, the record does not disclose the extent of the potential market in these outlying areas for Itek’s (or its competitors’) products; nor does it reveal the extent to which that potential had been exploited. With respect to GPD’s assigned territory, the record indicates that Itek had realized only 10-13 percent of the potential market for platemakers, and only 1-2 percent of the potential market for other graphic products.
 
 [2]
 

 Pursuant to this distributorship program, in 1975 an Itek representative approached Anthony Zatzos, a long-time Itek salesman, and asked if he would be interested in a distributorship. After several months of
 
 *1565
 
 negotiation, Zatzos formed GPD, and in July 1975 it received a distributorship covering seven BEMA areas in Georgia and South Carolina. The distributorship agreement between Itek and GPD provided as follows:
 

 1. GRANT OF DISTRIBUTORSHIP
 

 [Itek] hereby grants to [GPD] and [GPD] accepts, a non-exclusive, non-transferrable Distributorship to purchase for resale and to service the [Itek] products and equipment specified in the attached Schedule “A” hereinafter referred to as “Products” in the area hereinafter referred to as the “Territory.” [GPD] represents that [it] is actively engaged in the business of Graphic Equipment and supplies, Sales & Services and maintains 2 outside fulltime salesmen who regularly call on prospects and customers in the Territory hereinafter defined and maintains 2 outside fulltime Technical Service personnel in the same area.
 

 GPD began operations in September 1975, with Zatzos as its president and two other former Itek employees as the other principals; it distributed the full line of previously described Itek products in the seven BEMA areas.
 

 GPD made 90% of its sales within its assigned area, but 10% of its sales occurred within the territory of Itek’s Atlanta branch office. The Atlanta branch manager complained to Itek’s management about these sales, as well as a sale GPD made in Columbus, Georgia, to a customer within the territory of an Alabama-based distributor. Pursuant to a clause of the distributorship agreement providing for termination at will by either party upon 90 days written notice, Itek notified GPD on June 10, 1976 of its intent to terminate the agreement.
 

 GPD brought this suit in May 1977, alleging violations of federal and state antitrust law. The complaint alleged that pursuant to a contract, combination or conspiracy to restrain trade, Itek compelled its distributors, as a condition of doing business with them, to enter into agreements restricting them to reselling its products only within a designated geographical territory, and only to customers within that territory. The complaint further alleged that Itek terminated GPD pursuant to its conspiracy to maintain these territorial and customer restrictions. GPD also asserted that these trade restraints were for the purpose of fixing prices.
 

 In narrowing the issues for trial, the district court granted Itek’s motion for summary judgment on GPD’s price-fixing claim and on Itek’s permissive counterclaim for a debt. Neither of these rulings are presented to us for review. The court also rejected GPD’s claim that Itek’s dual distribution system was a horizontal restraint of trade
 
 [3]
 
 and should be considered under the per se rule. Again, this finding is not before us for review.
 

 The ease was tried before a jury in May 1981. Much, if not most, of the testimony at trial was devoted to a dispute about the reasons for GPD’s termination. At the close of GPD’s ease and at the close of all the evidence, Itek moved for a directed verdict. The court denied these motions. The jury returned a special verdict pursuant to Fed.R.Civ.P. 49(a). The jury specifically found: (1) Itek entered into a conspiracy, contract or combination with individuals or companies other than GPD the purpose of which was to restrain interstate trade or commerce; (2) the territorial restraints placed upon GPD by Itek were unreasonable and without valid business justification; (3) the motivating reason for the termination of GPD was GPD’s violation of the territorial restrictions; (4) GPD was injured in fact as the direct and proxi
 
 *1566
 
 mate result of the restraint placed upon it by Itek; (5) GPD suffered actual damage as a sole consequence of such injury. The jury awarded GPD $200,000 in damages.
 
 [4]
 

 Itek moved for judgment n.o.v. and, alternatively, for a new trial on the grounds that: (1) GPD failed to show the challenged restraint had an anticompetitive impact in the relevant market; and (2) GPD failed to prove the amount of its damages.
 
 [5]
 
 The district court summarily denied the motion and, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, tripled the jury’s damages award and granted reasonable attorney’s fees.
 

 II.
 

 At the outset, we must emphasize the limited character of our review. Itek’s challenge to the court’s failure to grant it a directed verdict or judgment n.o.v. is based on the insufficiency of the evidence to establish: (1) that the alleged restraints were unreasonable; and (2) the amount of GPD’s net economic loss. In this posture, we consider all of the evidence in the light and with all reasonable inferences most favorable to the party opposed to the motion. “If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions [for directed verdict or judgment n.o.v.] is proper.”
 
 Boeing Co. v. Shipman,
 
 411 F.2d 365, 374 (5th Cir.1969).
 
 [6]
 
 Thus, “[w]e must uphold the district court’s judgment unless ‘there is a complete absence of substantial probative facts to support the jury’s verdict.’ ”
 
 Copper Liquor, Inc.
 
 v.
 
 Adolph Coors Co.,
 
 624 F.2d 575, 579-80 (5th Cir.1980) (quoting
 
 Lavender v. Kurn,
 
 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946)).
 

 Section 1 of the Sherman Act literally prohibits every contract, combination or conspiracy in restraint of trade, but this has long been confined to only such concerted activity as unreasonably restrains trade.
 
 See, e.g., Standard Oil Co. v. United States,
 
 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911).
 
 [7]
 
 Itek’s basic argument is that the evidence was insufficient to show that its dual distribution system, complete with territorial restraints, was an
 
 unreasonable
 
 restraint of trade. We analyze this contention within the framework set out by the Supreme Court in
 
 Continental T.V., Inc. v. GTE Sylvania Inc.,
 
 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).
 

 In
 
 Sylvania,
 
 the High Court overruled
 
 United States
 
 v.
 
 Arnold, Schwinn & Co.,
 
 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967).
 
 Schwinn
 
 involved a complex, three-
 
 *1567
 
 level distribution system with a variety of territorial and customer restraints. The
 
 Schwinn
 
 Court began by stating “we are remitted to an appraisal of the market impact of these [restrictive] practices[,]”
 
 id
 
 at 373, 87 S.Ct. at 1862, but it failed to use economic analysis in distinguishing between those restrictive practices it condemned under the per se rule and those it found worthy of “rule of reason” treatment. Instead, it elevated to prime importance a purely legal distinction between “the situation where the manufacturer parts with title, dominion, or risk with respect to the article, and where he completely retains ownership and risk of loss.”
 
 Id
 
 at 378-79, 87 S.Ct. at 1865.
 

 The
 
 Schwinn
 
 Court held that where a manufacturer
 
 sells
 
 products to a wholesale distributor subject to territorial or customer restrictions upon resale, or places similar restraints upon the retailers to which the goods are sold, its conduct is per se unreasonable. It did not analyze market impact; it merely concluded “[s]uch restraints are so obviously destructive of competition that their mere existence is enough.”
 
 Id
 
 at 379, 87 S.Ct. at 1865. On the other hand, where the manufacturer retains ownership and the risk of loss, the more flexible rule of reason would apply. The Court then upheld that portion of the lower court’s opinion which found territorial allocation and franchising of retailers reasonable where agency or consignment arrangements alone were involved, and title to the goods did not pass.
 

 The
 
 Sylvania
 
 Court noted that the
 
 Schwinn
 
 opinion did not distinguish among the challenged restrictions on the basis of their respective competitive effects, but instead only on the basis of whether title to the goods had passed. 433 U.S. at 52, 97 S.Ct. at 2558. It pointed out that the opinion lacked “even an assertion ... that the competitive impact of vertical restrictions is significantly affected by the form of the transaction.”
 
 Id
 
 at 54, 97 S.Ct. at 2559. Because “an antitrust policy divorced from market considerations would lack any objective benchmarks[,]” the legality of particular vertical restrictions must henceforth be judged by their competitive impact.
 
 Id
 
 at 53, n. 21, 97 S.Ct. at 2559 n. 21. Finding that the form of the transaction by which a manufacturer conveys its products to its dealer does not affect the competitive impact of the vertical restrictions, the Court abandoned that basis for the per se rule of
 
 Schwinn.
 

 Turning to an analysis of the market impact of vertical restrictions, the High Court noted that they have a “potential for a simultaneous reduction of intrabrand competition and stimulation of interbrand competition.”
 
 [8]
 
 433 U.S. at 51-52, 97 S.Ct. at 2558. Without dwelling on their potential for reducing intrabrand competition, the Court discussed three of the ways that vertical restrictions can be wielded by a manufacturer to enhance its ability to compete interbrand: (1) they can be used by new manufacturers or manufacturers' entering new markets to induce competent and aggressive retailers to invest large amounts of capital and labor in the distribution of products unknown to the consumer (the “market access” rationale);
 
 id
 
 at 55, 97 S.Ct. at 2560; (2) they can be used by established manufacturers to induce retailers to spend money on promotional or servicing activities necessary to market their goods efficiently. These services are likely to increase sales and therefore it would appear to be in the self-interest of each retailer to provide them. However, individual retailers might fail to provide them in optimal amounts if other dealers could take a “free ride” on these services by not providing them, selling at a lower price, and at the same time enjoying the competitive benefits to the brand flowing from the providing dealer’s expenditures (the “dealer services-free-rider” rationale);
 
 id;
 
 (3) they can be used to ensure product quality and safety, in accordance with products liability
 
 *1568
 
 and consumer warranty law.
 
 Id.
 
 at 55 n. 23, 97 S.Ct. at 2560 n. 23.
 
 [9]
 

 Finding substantial authority supporting their economic utility, the Court concluded that the per se rule against vertical restraints stated in
 
 Schwinn
 
 must be overruled and the rule of reason employed instead. Since the Court of Appeals in
 
 Sylvania
 
 had distinguished
 
 Schwinn
 
 (a course the Supreme Court rejected in favor of overruling it), the High Court had no occasion to apply the rule of reason to the facts before it. It emphasized, however, that although particular applications of vertical restrictions might justify per se treatment, any future “departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than — as in
 
 Schwinn
 
 —upon formalistic line drawing.” 433 U.S. at 58-59, 97 S.Ct. at 2562.
 

 Sylvania
 
 places the competitive effects of particular vertical restraints at the center of the analysis under the rule of reason.
 
 Accord Muenster Butane, Inc. v. Stewart Co.,
 
 651 F.2d 292, 295, 296 (5th Cir.1981);
 
 Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,
 
 637 F.2d 1001, 1005 (5th Cir. Unit A),
 
 cert. denied,
 
 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). However, it provides us with little guidance as to how the rule should be applied.
 
 [10]
 
 We have narrowed the broad-ranging inquiry called for by the rule of reason by insisting, at the threshold, that a plaintiff attacking vertical restrictions establish the market power of the defendant:
 

 [a] requirement that plaintiff prove market power in this case would have saved the litigants and the courts much expense. [Defendant] had no market power in [the relevant geographic market]. The market was highly competitive. Whatever vertical restraints [defendant] imposed on its dealers, their effect could not have been to raise the price consumers paid for [the relevant product].”
 

 
 *1569
 

 Muenster Butane,
 
 651 F.2d at 298.
 
 [11]
 

 In order to establish the defendant’s market power, a plaintiff must first offer proof of “a well-defined relevant market upon which the challenged anticompetitive actions would have had a substantial impact.”
 
 Cornwell Quality Tools Co. v. C.T.S. Co.,
 
 446 F.2d 825, 829 (9th Cir.1971),
 
 cert. denied,
 
 404 U.S. 1049, 92 S.Ct. 715, 716, 30 L.Ed.2d 740 (1972). The relevant product and geographic market is a question of fact, and findings concerning the market should be overturned on appeal only if clearly erroneous or where there is no evidence to support the finding below.
 
 Associated Radio Service Co. v. Page Airways, Inc.,
 
 624 F.2d 1342, 1348-49 (5th Cir.1980),
 
 cert. denied,
 
 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 226 (1981).
 

 In this case, the court did not submit the issue of the relevant product and geographic market to the jury. Under Fed.R. Civ.P. 49(a), if the court omits any issue of fact raised by the pleadings or by the evidence, the court may make a finding itself or, if it fails to do so, it shall be deemed to have made a finding consistent with the judgment on the special verdict.
 

 Concerning the relevant geographic market, we observe that GPD did not challenge its distributorship termination alone as illegal; it challenged its termination pursuant to a
 
 nationwide
 
 distribution system that it claimed unreasonably restrained trade. Under this system, Itek divided the nation into exclusive territories, and there was testimony indicating nationwide compliance with these restrictions. Moreover, Itek enforced a policy against competitive bidding on governmental orders nationally. Finally, much of the testimony concerning Itek’s share of the market referred to its national market share, and GPD’s principal witness, Zatzos, testified about the national competitive effects of Itek’s alleged product superiority. There was ample evidence to support a finding that the relevant geographic market was national.
 

 The record is not so unequivocal with respect to the relevant product market. GPD clearly tried this case to the jury on the theory that the relevant product market was platemakers, despite the fact that the record indicated that Itek, and GPD, also sold duplicators, camera processors, and microfilm equipment.
 
 [12]
 
 All the market share data pertained exclusively to platemakers. Zatzos testified that Itek’s primary product line consisted of five models of automated platemakers; he emphasized this point throughout his testimony. He added that Itek sold imported duplicators, microfilm equipment and camera processors.
 

 Itek never challenged this characterization of the relevant product market.
 
 [13]
 
 Don Malagamba, Itek’s Vice President for United States Sales Operations, testified at length for the defendant but did not challenge Zatzos’ claim that platemakers were Itek’s major product line. His testimony largely reiterated that of Zatzos, stating
 
 *1570
 
 that Itek sold platemakers, duplicators, and camera processors. If data concerning the portions of Itek’s total sales deriving from each product and its “after-markets” for supplies and service would have refuted GPD’s claims, Malagamba surely would have enjoyed ready access to it. Malagam-ba gave no such testimony. Considering the evidence in the light and with all reasonable inferences favoring GPD, as we must do in our present posture, we believe the evidence supported a finding that the relevant product market was platemakers. We now consider Itek’s market power in the relevant market.
 

 Market power is the ability to raise price significantly above the competitive level without losing all of one’s business.
 
 Valley Liquors, Inc. v. Renfield Importers, Ltd.,
 
 678 F.2d 742, 745 (7th Cir.1982). Market share is frequently used in litigation as a surrogate for market power for two reasons. First, market power is conceptually difficult to define in any given case. Second, its measurement requires sophisticated econometric analysis. Therefore, market power is not well suited to presentation in an adversary proceeding.
 
 See Id.
 
 Moreover, market share directly relates to the effectiveness of interbrand competition in minimizing the anticompetitive effects of a restraint on intrabrand competition. Vertical Restrictions Limiting Intrabrand Competition 63 (ABA Antitrust Section Monograph No. 2 1977) (hereinafter cited as ABA Monograph);
 
 see Sylvania,
 
 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19.
 

 Itek enjoyed significant market power in the national platemaker market in 1975-76 when it was implementing the challenged dual distribution system. Zatzos testified that Itek enjoyed 70 to 75 percent of the national platemaker market during that period. Malagamba agreed that, despite some local variations, Itek had “on the average” approximately 70 percent of the national market. Samuel Reeder, another Itek Vice President, conceded that its strongest competitor in the platemaker field — A.B. Dick — had only 10 percent of the market, and several other firms divided the remaining 20 percent. The evidence indicated, moreover, that Itek designed its platemakers so that the supplies of its competitors could not be used therewith; thus, Itek equipment purchasers were locked into buying Itek supplies.
 
 [14]
 
 Finally, John Fountain, a principal of GPD specializing in the service area, indicated that there was little or no interbrand competition in the servicing of platemakers because of warranty prohibitions and the inability to service another company’s machines.
 

 In addition to establishing Itek’s large market share, GPD introduced substantial evidence pertaining to another major criterion of market power: product differentiation.
 
 [15]
 
 Zatzos and James Boswell, the third GPD principal, both testified that the Itek platemaker was a superior product to any then on the market. Zatzos stated “[t]here were other manufacturers that sold a piece of equipment that was designed to do the same type of job, but the operation of the equipment, the design of the equipment just wasn’t even a factor in the market place.” Joseph Crabtree, former Itek Atlanta District Manager, corroborated this testimony. Reeder confirmed that Itek was more often successful than not in writing the specifications for machinery on which governments would accept bids, thereby ensuring their success in the market for
 
 *1571
 
 government orders.
 
 [16]
 
 We are convinced that GPD satisfied its threshold burden of showing Itek had substantial market power when it imposed vertical restraints on its distributors.
 
 [17]
 

 Having crossed this threshold, GPD was required to take its “first step”: “show [an] anticompetitive effect, either in the intrabrand or interbrand markets.”
 
 H & B Equipment Co. v. International Harvester Co.,
 
 577 F.2d 239, 246 (5th Cir.1978). We emphasize, however, that demonstrating an anticompetitive effect is but the first step of what must be a systematic comparison of the negative effects of the restraint on intrabrand competition and interbrand competition, if any, with any alleged positive effects on interbrand competition stemming from the restraints. This is the critical analysis required by
 
 Sylvania. Muenster Butane,
 
 651 F.2d at 296.
 
 [18]
 

 Accord Donald B. Rice Tire Co.
 
 v.
 
 Michelin Tire Corp.,
 
 483 F.Supp. 750, 760 (D.Md.1980),
 
 aff’d,
 
 638 F.2d 15 (4th Cir.1981).
 

 We note first that a vertical restraint on trade, almost by definition, involves some reduction in intrabrand competition. When a manufacturer restricts a dealer to selling only within a certain territory, or only to certain customers, or only from certain locations, it is necessarily restraining intrab-rand competition. However, this may or may not have a negative effect on the welfare of the consumer. “[A]bstract lessening of intrabrand competition is not enough [to establish a cause of action for violation of the antitrust laws].”
 
 Aladdin Oil Co.
 
 v.
 
 Texaco, Inc.,
 
 603 F.2d 1107, 1116 (5th Cir.1979). The effects of a restraint of intrabrand competition on consumer welfare cannot be viewed in isolation from the interbrand market structure.
 
 [19]
 
 A restriction of intrabrand competition may — depending on the interbrand market structure — either enhance or diminish overall competition, and hence consumer welfare. As one commentator puts it, “the real issue remains whether the loss of intrabrand competition itself injures or benefits potential consumers of the brand in question. Those consumers are injured by the restraint if, without obtaining more services, they are denied intrabrand choices that are sources of consumer welfare, but are benefited [notwithstanding the restraint] if dealer services increase.” Gerhart,
 
 The “Competitive Advantages” Explanation For Intrabrand Restraints: An Antitrust Analysis,
 
 1981 Duke L.J. 417, 439. Moreover, if
 
 *1572
 
 enhanced dealer services to the consumer result from the restraint, interbrand competition should be sharpened.
 
 [20]
 

 The second implication of the
 
 Sylvania
 
 analysis is that even if a negative effect on consumer welfare and competition can be shown to flow from a restriction of intrab-rand competition, the court must still look to any possible pro-competitive effects on the interbrand market stemming from the
 
 *1573
 
 intrabrand restriction. The
 
 Sylvania
 
 court stressed increased market access for the manufacturer, increased dealer services to the consumer, and product safety and quality as examples, but clearly this list was intended to be illustrative rather than exhaustive. There are a wide variety of pro-competitive rationales for vertical restrictions on intrabrand competition.
 
 [21]
 

 To require an antitrust plaintiff to conjure up every possible pro-competitive rationale for a vertical restraint, and prove their inapplicability to the restraint in question, would be to impose an insurmountable burden. It would, in effect, convert the rule of
 
 Sylvania
 
 — that pro-competitive interbrand effects of vertical restraints must be considered — into a rule of per se legality for intrabrand restraints.
 
 Sylvania
 
 clearly does not extend that far, and we decline to so extend it on the facts of the case before us.
 
 [22]
 

 However, “[t]he burden of proving unreasonable effects [in a rule of reason case] rests with the antitrust plaintiff.”
 
 Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,
 
 549 F.2d 368, 380 (5th Cir.1977). Therefore, GPD, after crossing the threshold of showing Itek’s market power, was required to establish that the interbrand market structure was such that intrabrand competition was a critical source of competitive pressure on price, and hence of consumer welfare. GPD was also required to show that the nature and effects of the restraint were such as to be “substantially adverse” to market competition.
 
 United States v. Arnold, Schwinn & Co.,
 
 388 U.S. at 375, 87 S.Ct. at 1863,
 
 overruled on other grounds, Sylvania,
 
 433 U.S. at 57-58, 97 S.Ct. at 2561-62.
 
 [23]
 
 Of course, Itek was free to come forward with a showing that, notwithstanding its market power, the vertical restraints were reasonably necessary to achieve legitimate, pro-competitive purposes, and that the purpose and effect of the restraints were pro-competitive when viewed as a whole.
 
 [24]
 
 We now apply this analytical framework to the present case by analyzing first the effect of the intrabrand restraints on consumer welfare, in light of the interbrand market structure. We then analyze any possible pro-competitive effects on interbrand competition.
 

 GPD presented considerable evidence bearing on Itek’s anti-competitive
 
 intent
 
 in imposing territorial restrictions. Evidence of intent is highly probative “not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.”
 
 Chicago Board of Trade v. United States,
 
 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918).
 

 Lee Hollingsworth, Itek’s former sales manager for special accounts, stated that Itek’s purpose in assigning exclusive territories to branch offices and distributors was to have no competition between them. In a memorandum to all distributors explaining
 
 *1574
 
 a system of rules apportioning bids on state government orders between distributors and branches, Itek stated that their purpose was to avoid a distributor and an Itek branch office, two distributors or two branches competing with each other for the same order. The impetus for this anti-competitive bidding system was GPD’s “low-bidding” of Itek’s Atlanta branch office on a platemaker sale to the Georgia Department of Education. The regional manager wrote Don Malagamba stating that this territorial violation “could impact on direct sales with wide-spread adversity ... The dealer obviously was willing to risk all relationships with the Company in order to ‘grab’ the total order credit ... With increasing dealer activity throughout the South, such conflict with direct and indirect efforts must be avoided.”
 

 GPD also emphasized at trial the “airtight” or absolute nature of the territorial restraint system.
 
 [25]
 
 Itek Vice President Reeder admitted that this marketing system, if followed, completely eliminated in-trabrand competition, and Itek did not contest this point at trial. Clearly, complete elimination of intrabrand competition differs qualitatively from merely lessening it, if intrabrand competition is of proven importance to consumer welfare in the circumstances of the case under consideration.
 
 [26]
 
 We now consider GPD’s evidence about the anticompetitive
 
 effects
 
 of the restrictions, bearing in mind the evidence concerning Itek’s market power.
 

 GPD brought forth evidence that its “extra-territorial” activities in the area assigned to Itek’s Atlanta branch office were highly competitive with that office. Zatzos testified that GPD substantially underbid the Atlanta branch office on a contract to provide the Georgia Education Department with a platemaker, and that this caused consternation among Itek officials.
 
 [27]
 
 The jury found, and Itek does not contest on appeal, that territorial violations such as this were the reason for GPD’s termination. Zatzos testified that on at least two other occasions after GPD’s termination it underbid Itek in competition for orders and received the contract.
 

 Zatzos also testified that GPD charged only $19.00 per hour for servicing Itek machines, in contrast to $32.00 or $32.50 hourly rates charged by Itek. He stated that Itek complained about this pricing of service during the time GPD retained its distributorship.
 
 [28]
 
 Given the absence of interbrand
 
 *1575
 
 service competition, such intrabrand competition could have been important to consumer welfare. This possibility was borne out by the testimony of then-Itek President Preschlack: “[S]ervice was ten to twelve percent of the revenue generated by our field organization. It was the highest profit margin part of our sales, and it was a very important contributor of our profit.” Clearly, the jury could have inferred that elimination of GPD as a competitor would have eliminated competitive pressure on the price of service as well as on the price of equipment.
 
 [29]
 

 See Eiberger v. Sony Corp.,
 
 622 F.2d 1068, 1080 (2d Cir.1980).
 

 This intrabrand competition existed in the context of Itek’s considerable interbrand market power. We have discussed the importance of market share in minimizing the anticompetitive effects of a restraint of intrabrand competition,
 
 supra
 
 at 1569-1570. The product differentiation achieved by Itek, owing to the superiority of its platemakers, also suggests that intrabrand competition was an important source of consumer welfare: “significant product differentiation increases somewhat the importance of intrabrand competition between distributors and increases correspondingly the required justification for abolishing it.”
 
 Sandura Co. v. FTC,
 
 339 F.2d 847, 857 (6th Cir.1964);
 
 accord
 
 ABA Monograph, 64-65 (“The greater the product differentiation, the lesser the degree to which interbrand competition will be effective.”); Gerhart,
 
 supra,
 
 1981 Duke L.J. at 442 (“One must determine whether a firm — because of product differentiation or some other advantage over its rivals — has a degree of discretionary power that makes consumer choice between outlets selling that firm’s product an important source of consumer welfare.”)
 

 We are convinced that there was sufficient evidence for the jury to find that intrabrand competition, in this context, was an important source of competitive pressure on price, and that Itek’s system of territorial restraints — which totally foreclosed in-trabrand competition — had substantially adverse effects on price competition and consumer welfare. This does not conclude our inquiry. We must now consider the record evidence concerning the possible positive effects of this system on interbrand competition.
 

 A manufacturer will generally seek to ensure that its dealers sell its product at as low a price as is possible, given the price at which it sells its product to them, in order to maximize retail sales.
 
 Red Diamond Supply, Inc.,
 
 637 F.2d at 1004 n. 4. The
 
 Red Diamond
 
 court explained why a manufacturer will sometimes restrain intrabrand competition in the sale of its product in order to enhance interbrand competition:
 

 A manufacturer ... will typically encourage intrabrand competition in order to enhance interbrand competition, i.e., the competitiveness of its product with those of other manufacturers. Sometimes, however, a manufacturer will find it advantageous to impose restrictions, such as assigned territories, on its distributors in order to induce them to undertake advertising or promotional activities, to render more or better services to customers, or simply to push the product more vigorously. By facilitating such efforts on the part of distributors, the restrictions tend to increase retail sales of the product, and may do so on balance even if they also generate some increase in the price the distributors charge. Thus, restrictions on intrabrand competition are sometimes a means whereby a manufacturer can increase interbrand competition.
 

 Id.
 
 The manufacturer restricts intrabrand price competition in order to stimulate the nonprice competition which it believes will
 
 *1576
 
 maximize interbrand competition (retail sales).
 

 When the evidence supports a finding that vertical restrictions on intrabrand competition seek to and do enhance inter-brand competition — in any of a variety of ways — we have not hesitated to uphold them under the rule of reason.
 
 See, e.g., Muenster Butane,
 
 651 F.2d at 297 (supplier refusal to provide dealer with model of television set intended to discourage dealer free-riding on the promotional efforts of a competing dealer);
 
 Red Diamond,
 
 637 F.2d at 1006 (territorial restrictions designed to increase dealer services to customers and thus differentiate an otherwise homogeneous product);
 
 Del Rio Distributing, Inc.
 
 v.
 
 Adolph Coors Co.,
 
 589 F.2d 176, 179 (5th Cir.),
 
 cert. denied,
 
 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979) (territorial restrictions essential to maintaining quality control and service). However, merely offering a rationale for a vertical restraint will not suffice; the record must support a finding that the restraint in fact is necessary to enhance competition and does indeed have a pro-competitive effect.
 
 See Eiberger v. Sony Corp.,
 
 622 F.2d at 1078-79 (factual predicates for dealer services — free-rider rationale not present in the record); Stewart & Roberts,
 
 Viability of the Antitrust Per Se Illegality Rule: Schwinn Down, How Many To Go?,
 
 58 Wash.U.L.Q. 727, 756 (1980) (frequently point-of-sales services unnecessary and free-rider problem does not exist); Gerhart,
 
 supra,
 
 1981 Duke L.J. at 443 (explaining factual predicates for the existence
 
 vel non
 
 of free-rider problem).
 
 Cf. Copper Liquor, Inc. v. Adolph Coors Co.,
 
 506 F.2d 934, 944-45 (5th Cir.1975) (refusal to temper then-applicable
 
 Schwinn
 
 rule of per se illegality of territorial restrictions where record did not support conclusion that restraints were necessary to induce dealer investment or to protect product integrity). Absent direct evidence of positive effects on competition, careful analysis of the pro-competitive rationales offered for a restraint in the light of the record is essential, in that sometimes one pro-competitive rationale will apply to a given case, whereas a second will not.
 
 Compare
 
 Preston,
 
 Restrictive Distribution Arrangements: Economic Analysis and Public Policy Standards,
 
 30 Law & Contemp.Probs. 506, 526-27 (1965) (market penetration rationale did not justify
 
 Schwinn’s
 
 territorial restrictions since no link existed between restraints and expanded market coverage)
 
 with
 
 Williamson,
 
 Assessing Vertical Market Restrictions: Antitrust Ramifications of the Transaction Cost Approach,
 
 127 U.Pa.L.Rev. 953, 975-80 (1979)
 
 (Schwinn
 
 restrictions needed to create and maintain product differentiation while minimizing transactions costs). We now consider the evidence offered below in support of Itek’s territorial restraints.
 

 We note initially that this case involves a dual distribution system. Itek manufactures graphic products, but it also distributes them and thus operates at the same market level as its independent distributors. The district court correctly ruled that the restraints Itek imposed on its distributors were nonetheless vertical, and should be tested under the rule of reason.
 
 Abadir & Co. v. First Mississippi Corp.,
 
 651 F.2d 422, 427-28 (5th Cir.1981);
 
 Red Diamond,
 
 637 F.2d at 1004. However, when a manufacturer also acts as a dealer, competing with other dealers, it may no longer have the exclusive interest in a low margin, high volume distribution system that we ordinarily attribute to it, supra at 1575. The
 
 Abadir
 
 court noted: “Not all of the legitimate potential economic advantages noted in
 
 Sylvania
 
 apply with the same force to this case.. .. [TJhose normal market factors encouraging a supplier to let its distributors compete are less effective to the extent that [the defendant-manufacturer] also competes as a distributor.” 651 F.2d at 427. Although we treat Itek’s restraints as vertical, its motivation to restrict competition from its independent distributors is a factor in our analysis of its alleged pro-competitive purposes.
 
 [30]
 

 
 *1577
 
 Itek offered two pro-competitive justifications for its territorial restraints at trial. The first justification was to provide adequate servicing for its equipment to customers in the outlying areas. Itek Vice President Malagamba testified that Itek structured its dual distribution system so that branch offices would have to travel a maximum of 50 miles to provide service. Dealers would provide service in the outlying areas, and all customers would be efficiently and adequately serviced by a proximate Itek representative. The goal of adequate and efficient service in territories beyond the branch office location was legitimate and pro-competitive, but there was no showing — nor any serious attempt to show — that the territorial restrictions were reasonably necessary to achieve that legitimate purpose.
 
 [31]
 

 The GPD principal involved with service, John Fountain, indicated that GPD had two full-time employees dedicated to providing service, and a salesman who also worked on service. This testimony tended to show that Itek’s purpose of improved service coverage had been achieved by employing GPD as an independent distributor. However, at the same time, Zatzos indicated that he would sell Itek products only where he could effectively sell them and support them. Itek presented no evidence to show
 
 *1578
 
 that the absolute territorial restrictions — as opposed to the use of independent distributors — were important to the goal of improved service coverage. There was no evidence indicating that Itek or any of its customers were dissatisfied with the service GPD provided.
 
 [32]
 

 The second pro-competitive rationale Itek offered for its territorial restraints was enhanced market penetration. Unlike the service rationale, Itek attempted to relate this rationale directly to its abolition of intrab-rand competition. Malagamba testified:
 

 The policy of the company was to promote [interbrand] competition ... and to do that, we put dealers and distributors in certain outlying areas to do it more effectively.
 

 You can’t effectively compete . . . unless the dealer who contracts for the area and agrees to put his best efforts forth to selling your product in that area does not [sic] do so.
 

 If he sells his product in some other area, then it has the effect of reducing competition against those people in the area that he is assigned and agree[d] to take over to sell my products.
 

 Zatzos agreed that the reason for the establishment of distributorships was to provide better market coverage, but vigorously contested both Itek’s claim that GPD was not adequately covering its assigned area and the suggestion that the territorial restrictions were needed to ensure such coverage.
 

 The jury specifically found that GPD’s extra-territorial sales and not,
 
 inter alia,
 
 inadequate performance in its assigned area, were the reason for GPD’s termination. This finding, amply supported by the record, is not challenged by Itek here; this tends to undermine its claim that territorial restrictions were needed to ensure market penetration. Other than the bare assertion by Malagamba, there was no showing that intrabrand competition of the kind attempted by GPD in fact detracted from market penetration in the outlying areas,
 
 [33]
 
 and Zat-zos testified that intrabrand competition would have resulted in greater market penetration.
 

 From this conflicting evidence, we cannot say that the facts and inferences pointed so strongly in the direction of a finding that Itek’s restraints were pro-competitive in purpose and effect that reasonable persons could not have arrived at a contrary verdict. Nor can we say that, having passed the threshold of proving Itek’s market power, GPD failed to produce substantial, probative evidence to support the jury’s finding that the restraint had substantially adverse effects on competition, which competition was an important source of consumer welfare. We must therefore affirm the district court’s refusal to grant Itek’s judgment n.o.v. motion on the issue of liability.
 
 [34]
 

 III.
 

 Itek also contends that the evidence was insufficient to establish the amount of
 
 *1579
 
 GPD’s damages. It argues that GPD failed to provide evidence concerning its net profits, that GPD failed to provide evidence concerning profits derived from the sale of non-Itek products, and that GPD failed to submit evidence that it mitigated its damages. We first address the burden of proof an antitrust plaintiff must shoulder to establish a jury question regarding the
 
 amount
 
 of its damages, and then discuss Itek’s specific contentions in light of the applicable standard.
 

 Itek does not contest that if it committed an antitrust violation, and we have so held in Part II,
 
 supra,
 
 that violation caused injury in fact to GPD’s business.
 
 [35]
 
 Once an antitrust violation and its causal relation to plaintiff’s injury have been established, the burden of proving the amount of damages is much less severe.
 
 Construction Aggregate Transport, Inc. v. Florida Rock Industries, Inc.,
 
 710 F.2d 752, 785 (11th Cir. July 29, 1983);
 
 Malcolm
 
 v.
 
 Marathon Oil Co.,
 
 642 F.2d 845, 858, 864 (5th Cir.),
 
 cert. denied,
 
 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981);
 
 see J. Truett Payne Co. v. Chrysler Motors Corp.,
 
 451 U.S. 557, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981).
 

 In
 
 Zenith Radio Corp. v. Hazeltine Research, Inc.,
 
 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969), the Court pointed out that
 

 damage issues in these cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts. The Court has repeatedly held that in the absence of more precise proof, the factfinder may “conclude as a matter of just and reasonable inference from the proof of defendants’ wrongful acts and their tendency to injure plaintiffs’ business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants’ wrongful acts had caused damage to the plaintiffs.”
 

 Id.
 
 at 123, 89 S.Ct. at 1576-77 (quoting
 
 Bigelow v. RKO Radio Pictures, Inc.,
 
 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946)). The Court eloquently explained the reason for this rule in
 
 Story Parchment Co. v. Paterson Parchment Paper Co.,
 
 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931): “[w]here the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.”
 
 Accord Bigelow,
 
 327 U.S. at 264-65, 66 S.Ct. at 580. While a jury may not base its judgment on speculation or guess-work,
 
 Zenith,
 
 395 U.S. at 124, 89 S.Ct. at 1577, all that can be required is a just and reasonable — albeit necessarily imprecise — estimate based upon relevant data.
 
 Greene v. General Foods Corp.,
 
 517 F.2d 635, 665 (5th Cir.1975),
 
 cert. denied,
 
 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976).
 

 GPD sought to recover damages based on two alternative measures: diminution or destruction of the value of GPD as a going concern, and loss of future profits. It is established beyond peradventure that going concern value and lost future profits are valid alternative measures of antitrust damages.
 
 Lehrman v. Gulf Oil Corp.,
 
 500 F.2d 659, 663-64 (5th Cir.1974)
 
 (Lehrman
 
 II),
 
 cert. denied,
 
 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400 (1975). The only question before us is the sufficiency of the evidence to create a jury question on either of these two alternatives.
 
 [36]
 

 
 *1580
 
 The
 
 only
 
 evidence in the record about the going concern value of GPD was the testimony of plaintiff Zatzos that
 

 I would have to say that in consulting with accountants and consulting with business brokers, that [GPD] had to be worth at least three times its annual gross profit. So we are looking at a business that could be valued at over $400,000.
 

 Zatzos did not name these hearsay declar-ants nor did he provide any analytical or factual basis for his formula. Itek neither objected to this testimony when it was elicited nor moved to strike it from the record, despite its patent inadmissibility.
 
 See, e.g., Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,
 
 532 F.2d 957, 998-1000 (5th Cir.1976) (even expert testimony based on assumptions lacking probative value should be excluded);
 
 Herman Schwabe, Inc. v. United Shoe Machinery Corp.,
 
 297 F.2d 906, 911-13 (2d Cir.),
 
 cert. denied,
 
 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962), (even expert testimony should be excluded where its basic assumption lacks any support). However, we agree that this testimony lacked all probative value and failed to create a jury question on the going concern value of the business.
 
 [37]
 
 We now consider GPD’s proof of lost future profits.
 
 [38]
 

 Zatzos testified, without objection or cross-examination from Itek, that GPD realized a
 
 gross
 
 profit of $146,000 in 1976, the year in which its distributorship was terminated. He also testified, again without objection or cross-examination, that
 
 gross
 
 profits declined $61,000 in 1977 (GPD apparently went out of business sometime in 1978). If Itek had objected to this testimony, it would properly have been excluded since, standing alone, it was irrelevant. An antitrust plaintiff may recover only lost net profits, which are determined by subtracting the costs of a business from its gross revenue.
 
 See Eastman Kodak Co. v. Southern Photo Materials Co.,
 
 273 U.S. 359, 379, 47 S.Ct. 400, 405, 71 L.Ed. 684 (1927);
 
 Deaktor v. Fox Grocery Co.,
 
 475 F.2d 1112, 1116 (3d Cir.),
 
 cert. denied,
 
 414 U.S. 867, 94 S.Ct. 65, 38 L.Ed.2d 86 (1973);
 
 Lehrman v. Gulf Oil Corp.,
 
 464 F.2d 26, 43 n. 14 (5th Cir.),
 
 cert. denied,
 
 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972)
 
 (Lehrman
 
 I). In any event, Zatzos’ testimony about gross profits was non-probative in that it could not have assisted the jury in gleaning the net profits GPD lost as a result of Itek’s antitrust violation.
 

 Zatzos also testified, however, about GPD’s financial records, all of which were in evidence. He identified a financial statement for GPD’s first quarter of operation ending December 31, 1975; financial statements for the succeeding four quarters, ending December 31, 1976; and a final financial statement as of December 31, 1977. All of these statements had been admitted into evidence without any foundation and without any objection from Itek.
 

 Each statement, prepared by a certified public accounting firm, contained on its face the following disclaimer: “[t]hese statements have been prepared from records and information made available to us and are submitted solely for use by [GPD’s] management. Our engagement did not in-
 
 *1581
 
 elude any audit or examination of your books and accounts and for this reason no representation is made, nor should be implied, that we express any opinion as to the accuracy of these statements.” The statements gave no clue as to the identity of the person or persons who prepared them. The comprehensive disclaimer, coupled with the possibility of multiple hearsay, sufficed to deprive these statements of all probative value when considered standing alone.
 

 However, Zatzos testified — again without objection or cross-examination from Itek— that the financial statements accurately reflected all of GPD’s purchases and sales, and its income and earnings. Thus, the president and chief executive officer of GPD adopted these statements as his own, vouched for their accuracy, and in effect impeached the accountant’s disclaimer. Since there was no objection that Zatsos lacked the requisite knowledge to give this testimony, and since he owned and operated GPD, the jury could have fairly assumed that he knew enough to make this statement. Zatzos’ testimony thus sufficed to endow these financial statements with sufficient indicia of reliability to have some probative value.
 

 These financial statements clearly indicated GPD’s net profits record after all expenses.
 
 [39]
 
 GPD began operations in mid-September 1975, and in its initial quarter of operations ending December 31, 1975, GPD sustained a net loss of $4,531.62. In its second quarter, GPD had a net profit of $8,440.98. In the following quarter, during which GPD received its termination notice from Itek, GPD lost $847.61. In the next quarter, GPD lost $5,325.62. The final two quarters of 1976 showed accelerating losses, which continued throughout 1977.
 
 [40]
 

 Zatzos’ testimony — once again subjected neither to objection nor cross-examination by Itek — placed this brief earnings record in a most favorable light. He stated that when GPD was terminated by Itek — notice of termination was received June 10, 1976— the business was beginning to generate profits. He said that the initial, organizational phase of the business had just ended, and the firm’s efforts were increasingly devoted to augmenting sales. He testified that business was increasing gradually each month, and that customer satisfaction led to repeat business. He also projected that he would have continued to have gotten repeat business from those customers in the future.
 

 As to the duration of lost future profits, Zatzos testified that he was a man in his late forties and had a number of working years ahead, and that Boswell — one of the other two GPD principals — was a little younger. He stated that all the GPD prin
 
 *1582
 
 cipals were still alive, working and in good health. He indicated a desire to work actively for the next ten years.
 

 On a motion for directed verdict, the only issue is whether there is enough evidence for the jury to arrive at a reasonable estimate of the amount of the plaintiffs damages under any theory of the law advanced by the plaintiff. That
 
 some
 
 of plaintiffs evidence may be too speculative for the jury’s consideration does not justify granting the motion; this problem can be handled by appropriate jury instructions.
 
 [41]
 
 Under the less rigorous standard of proof of damages required of plaintiffs who have suffered antitrust injury, we hold that GPD produced sufficient evidence to create a jury question about the quantum of its damages.
 

 GPD was a very young business, in operation barely nine months when it received its termination notice from Itek. We have pointed out that calculating damages is particularly difficult when the future profits of a young enterprise are at stake, since there is no reliable track record to look back on: “[b]ut uncertainty cannot end the efforts of the federal courts to redress the harm caused proprietors by violations of the freedom of the marketplace.”
 
 Lehrman I,
 
 464 F.2d at 45. We have previously held that evidence of a business’ profits record over the eight-month period preceding its demise sufficed to create a jury question on lost profits.
 
 Malcolm v. Marathon Oil,
 
 642 F.2d at 864.
 

 Moreover, a business need not have been operating at a profit in order to recover lost future profits. Although there can be no recovery when there are nothing but losses in the past and no probative evidence of profits in the future, we have upheld a damages award for a never-profitable business: “[t]o deny recovery to a businessman who has struggled to establish a business in the face of wrongful conduct by a competitor simply because he never managed to escape from the quicksand of red ink to the dry land of profitable enterprise would make a mockery of the private antitrust remedy.”
 
 Terrell v. Household Goods Carriers’ Bureau,
 
 494 F.2d 16, 23 n. 12 (5th Cir.),
 
 cert. denied,
 
 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974);
 
 accord Construction Aggregate Transport, Inc.,
 
 at 789 n. 72.
 

 GPD showed a net loss during its first quarter of operations, which it attributed to its start-up costs, and a profit of over $8,400 in its second quarter. This was the quarter preceding GPD’s receipt of its termination notice from Itek. During the next quarter GPD lost slightly over $800.00, and it continued to suffer losses for the remaining year and one-half of its life. The jury could have concluded from this evidence, and the testimony projecting future profits, that GPD suffered damages in the approximate amount of $200,000.
 
 [42]
 

 
 *1583
 
 Itek’s remaining attacks on the sufficiency of GPD’s evidence of damages have no merit. There was testimonial and documentary evidence indicating the proportion of GPD’s sales derived from non-Itek products. The jury could have reduced its award by a percentage attributable to the proportion of GPD’s sales derived from non-Itek products (18-20%). Since we do not have the transcripts of counsel’s arguments to the jury, see note 39
 
 supra,
 
 we do not know how the jury was urged to calculate damages.
 

 In any event, Itek never challenged at trial GPD’s right to recover lost profits on the sales of non-Itek goods caused by the antitrust violation. We cannot assume that such profits are never recoverable.
 
 See Greene v. General Foods Corp.,
 
 517 F.2d at 663-64 (sales of some product lines can affect distributor’s sales of other products). Since the point was not contested below, we would need to make such an assumption in order to set aside this jury’s damage award on the ground that the evidence was insufficient to allow it to' make an appropriate deduction.
 

 Finally, there was ample evidence that GPD mitigated its damages. It kept alive a business despite an accelerating tide of red ink in order to fulfill its contractual commitments. Itek failed to challenge this testimony or present any evidence of its own on the mitigation issue. It thereby forfeited any right to a directed verdict on this ground.
 
 [43]
 

 Finding sufficient evidence to support the jury’s findings on both liability and damages, we
 

 AFFIRM.
 

 [1]
 

 . The microfilm products were being phased out of Itek’s product line at the time relevant to this litigation.
 

 [2]
 

 . Itek derived these figures by comparing Itek’s customers with all businesses in the area that resembled those customers and might conceivably have some need for Itek’s (or a competitor’s) products. The figures thus were largely unrelated to the actual market for these goods, and had no relation to Itek’s actual market share in these areas. Determining a firm’s market share requires a comparison between the sales of that firm and the total sales of all products which are close substitutes.
 

 [3]
 

 . “Vertical agreements are those among persons at different levels of the market structure —i.e., among a manufacturer and its distributors — in contradistinction to horizontal agreements among competitors at the same level of the market structure — i.e., among manufacturers or distributors.” Vertical Restrictions Limiting Intrabrand Competition 2 n. 3 (ABA Antitrust Section Monograph No. 2 1977) (citations omitted) (hereinafter called “ABA Monograph”).
 

 [4]
 

 . Only the federal antitrust claims were submitted to the jury. During the course of the trial, the state law claims were either abandoned or involuntarily dismissed, the record not revealing the basis for their disposition. They are not involved in this appeal.
 

 [5]
 

 . Itek also claimed that GPD had not shown an agreement in restraint of trade, a point it does not pursue in this appeal. We note that the grounds for which Itek sought a new trial were identical to those for which it sought judgment n.o.v. Therefore, we treat these arguments— which go to the sufficiency of the evidence— under the standard applicable to judgment n.o.v. motions.
 

 [6]
 

 .
 
 See Bonner v. City of Prichard,
 
 661 F.2d 1206, 1209 (11th Cir.1981) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to September 30, 1981).
 

 [7]
 

 . “However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use.”
 
 Northern Pac. Ry. Co. v. United States,
 
 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). More recently, this per se rule of unreasonableness has been described as applying to “agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality_”
 
 National Society of Professional Engineers v. United States,
 
 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978). All restraints not falling under one of the per se categories of unreasonableness are tested under the “rule of reason”: “the factfinder weighs all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition.”
 
 Continental T.V., Inc. v. GTE Sylvania Inc.,
 
 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).
 

 [8]
 

 . “Interbrand competition is the competition among the manufacturers of the same generic product ... and is the primary concern of antitrust law.... [I]ntrabrand competition is the competition between the distributors— wholesale or retail — of the product of a particular manufacturer.”
 
 Id.
 
 at 52 n. 19, 97 S.Ct. at 2558 n. 19.
 

 [9]
 

 . The Court also noted the view of certain analysts that “the manufacturer’s interest [in imposing vertical restrictions on its distributors] necessarily corresponds with that of the public ... [,]”
 
 id.
 
 at 56, 97 S.Ct. at 2560, but pointed out that this view was not universally shared, and declined to comment further. The analyses cited — Bork,
 
 The Rule of Reason and the Per Se Concept: Price Fixing and the Market Division
 
 [II], 75 Yale L.J. 373 (1966); Posner,
 
 Antitrust Policy and the Supreme Court: An Analysis of the Restricted Distribution, Horizontal Merger and Potential Competition Decisions,
 
 75 Colum.L.Rev. 282 (1975) — have since been updated to reflect the
 
 Sylvania
 
 decision.
 
 See
 
 Posner,
 
 The Rule of Reason and the Economic Approach: ReBections on the Sylvania Decision,
 
 45 U.Chi.L.Rev. 1 (1977); Posner,
 
 The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,
 
 (hereinafter: “Per Se Legality”), 48 U.Chi.L.Rev. 6 (1981); Bork,
 
 Vertical Restraints: Schwinn Overruled,
 
 1977 Sup.Ct.Rev. 171. To our knowledge, however, no commentator has suggested that a rule of per se legality should apply when the manufacturer, as here, has a dual distribution system under which it operates at the same market level as the distributors upon which it places restrictions. Posner, without explanation, specifically limits his analysis to restrictions upon competition among dealers, as distinct from customer reservations by the manufacturer. Posner,
 
 Per Se Legality,
 
 48 U.Chi.L.Rev. at 7.
 

 [10]
 

 . Not called upon to apply the rule of reason to the facts at hand, the Court merely recited the classical articulation of the rule by Justice Brandéis in
 
 Chicago Board of Trade v. United States,
 
 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918):
 

 The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be attained, are all relevant facts. This is not because a good intention will save an otherwise objectionable regulation or the reverse; but because knowledge of intent may help the court to interpret facts and to predict consequences.
 

 Sylvania,
 
 433 U.S. at 49 n. 15, 97 S.Ct. at 2557 n. 15. The exceedingly general nature of these factors, and the absence of an analytical framework for applying the rule of reason, has been discussed by commentators of every persuasion.
 
 See, e.g., ABA Monograph, supra,
 
 at 54-55; Posner,
 
 Per Se Legality, supra,
 
 48 U.Chi.L.Rev. at 14-15; Pitofsky,
 
 The
 
 Sylvania
 
 Case: Antitrust Analysis of Non-Price Vertical Restrictions,
 
 78 Colum.L.Rev. 1, 11, 34 (1978),
 

 [11]
 

 . Then Professor, now Judge, Posner has clearly explained the rationale for this threshold requirement:
 

 The absence of market power in the inter-brand market implies that the defendant is in competition with firms that sell products regarded by the consumer as close substitutes for the- defendant’s. The defendant will therefore lose most or all of its sales if its retail price exceeds its competitors’ retail price for any reason, including a lack of in-trabrand competition that drives its costs of distribution up .... [I]f a firm lacks market power, it cannot affect the price of its product; that price is determined by the market.
 

 Posner,
 
 Per Se Legality, supra,
 
 48 U.Chi.L.Rev. at 16.
 
 See ABA Monograph, supra,
 
 at 62 (“To determine the significance of the effects of an intrabrand restraint on overall competition, the market power of the product on which the intrabrand restriction has been placed must be assessed.”) The Seventh Circuit has subsequently followed
 
 Muenster Butane. See Valley Liquors, Inc. v. Renfield Importers, Ltd.,
 
 678 F.2d 742, 745 (7th Cir.1982) (Posner, J.).
 

 [12]
 

 . See note 1
 
 supra.
 

 [13]
 

 . Itek cross-examined Zatzos at considerable length, but did not dispute his testimony that platemakers were Itek’s principal product. Since Zatzos stated he had been an Itek employee for 13 years prior to founding GPD, the jury likely gave credence to this portion of his testimony.
 

 [14]
 

 . Malagamba indicated that purchasers of the A.B. Dick platemaker cartridge could break it open and use it in the Itek machine, and that Itek had once lost $400,000 in sales to an A.B. Dick dealer in that fashion, but this testimony seems only to reinforce the general point.
 

 [15]
 

 . “[PJroduct differentiation can be based on styling, packaging, advertising, service and other non-price competition. To the extent that product differentiation has been created, a company will have additional freedom to raise the price of its product above that of competing brands while still retaining a substantial portion of its business.” ABA Monograph,
 
 supra,
 
 at 64. For an introductory discussion of the economics of product differentiation, see P. Samuelson,
 
 Economics,
 
 487-90 (10th ed. 1976).
 

 [16]
 

 . In addition to this testimony concerning market share and product differentiation, GPD also offered some direct evidence concerning market power. Zatzos stated that, in competitive bidding for government contracts, Itek invariably bid from its retail price list. Itek furnished these price lists to every branch office and distributor. Zatzos also said that Itek “could sell ... according to the price book. We could sell — we could dictate the price basically. I mean, we could maintain a high price for the equipment with a high profitable margin.” Regarding platemakers, Zatzos said that interbrand competition had no effect on Itek’s pricing structure. He stated that he was able to sell them at a higher price than his competitors because the Itek platemaker was superior.
 

 [17]
 

 . We are not unaware of the distinction between short-run monopoly power, which looks at market structure at any instant and corresponds to short-run power over pi ice, and long-run monopoly power, which stresses the power to exclude rivals. A firm may have short-term power to control price without any long-run ability to restrict competition. See Schmalensee, On
 
 the Use of Economic Models in Antitrust: The
 
 Realemon
 
 Case,
 
 127 U.Pa.L.Rev. 994, 1005-16 (1979). However, Itek offered no evidence indicating an absence of long-run market power.
 

 [18]
 

 . It should be clear from the textual discussion that follows that this systematic comparison does not necessarily involve a weighing or balancing of the effects of a restraint on intrabrand competition with its effects on interbrand competition. The Supreme Court has cautioned about the difficulty inherent in such a weighing process.
 
 United States v. Topco Associates, Inc.,
 
 405 U.S. 596, 610-11, 92 S.Ct. 1126, 1134, 31 L.Ed.2d 515 (1972). Under the rule of reason, the interbrand market context in which intrabrand restraints are imposed will often allow us to determine its effects on overall competition without recourse to a balancing analysis. If a balancing of pro- and anti-competitive effects ultimately proves necessary, it would appear to be sanctioned by the Supreme Court. See
 
 Sylvania,
 
 433 U.S. at 57 n. 27, 97 S.Ct. at 2561 n. 27.
 

 [19]
 

 . See note 11
 
 supra
 
 and accompanying text.
 

 [20]
 

 . The argument, pressed by Itek at length here, that the reduction or elimination of in-trabrand competition is, by itself, never sufficient to show that a trade restraint is anticom-petitive must rest, at bottom, on the view that intrabrand competition — regardless of the circumstances — is never a significant source of consumer welfare. This view is simply not supported by economic analysis, or by the cases. A seller with considerable market power in the interbrand market — whether stemming from its dominant position in the market structure or from the successful differentiation of its products — will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold. Dealers, by competing against each other and bidding the retail price down, will in turn exert downward pressure on the seller’s wholesale price in order to maintain their profit margins. Thus, in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price. Rather than promoting nonprice competition, vertical restraints in this context may enable a manufacturer to retain monopoly profits arising from an interbrand competitive advantage. Gerhart,
 
 supra,
 
 1981 Duke L.J. at 426-29. See
 
 Coleman Motor Co. v. Chrysler Corp.,
 
 525 F.2d 1338, 1347 (3d Cir.1975) (where manufacturer has discretion to raise prices over interbrand competitors, elimination of intrabrand competition injurious to consumer welfare because it eliminates source of downward pressure on price).
 

 Itek misreads our statement in
 
 Daniels v. All Steel Equipment, Inc.,
 
 590 F.2d 111, 113 (5th Cir.1979) that “a reduction in intrabrand competition is not pernicious as long as there exists interbrand competition, which acts as a ‘significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product.’ ” (quoting
 
 Sylvania,
 
 433 U.S. at 53 n. 19, 97 S.Ct. 2559 n. 19). Daniels was a case “weaker than, although analogous to, the dealer termination cases. We ... look to those cases for the standard against which to test the propriety of summary judgment.”
 
 Id.
 
 at 112. We have emphasized time and again that mere termination of a dealer — even an arbitrary and unfair termination — does not constitute an antitrust violation actionable under the treble damages provisions of the Clayton Act. See,
 
 e.g., Kestenbaum v. Falstaff Brewing Corp.,
 
 575 F.2d 564, 571 (5th Cir.1978),
 
 cert. denied,
 
 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979);
 
 Burdett Sound, Inc. v. Altec Corp.,
 
 515 F.2d 1245, 1249 (5th Cir.1975).
 

 “The antitrust laws were designed to protect
 
 competition
 
 and not necessarily
 
 competitors.” Almeda Mall, Inc. v. Houston Lighting & Power Co.,
 
 615 F.2d 343, 354 (5th Cir.) (citing
 
 Brown Shoe Co. v. United States,
 
 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)),
 
 cert. denied,
 
 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980).
 

 Itek states in its brief to this court that GPD’s claim is that Itek’s distribution system violated the antitrust laws, and that GPD’s termination was illegal only insofar as Itek’s distribution system was illegal. In fact, Itek specifically distinguished the dealer termination cases from the present case in that the latter involves an allegedly unlawful
 
 system of
 
 distribution. The
 
 Daniels
 
 language simply has no application outside of the dealer termination context, as the Second Circuit pointed out in
 
 Eiberger v. Sony Corp.,
 
 622 F.2d 1068 (2d Cir.1980). “In both of these cases
 
 [Daniels
 
 and
 
 Oreck Corp. v. Whirlpool Corp.,
 
 579 F.2d 126 (2d Cir.) (en banc),
 
 cert. denied,
 
 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981)] the only conduct alleged to be a violation was the termination itself. Each termination was effected pursuant to provisions of a dealership contract which contained no restraints that were challenged as unreasonable.”
 
 Id.
 
 at 1081. Relying in part on a footnote in
 
 Sylvania
 
 suggesting that balancing intrabrand and interbrand competitive effects of vertical restrictions
 
 is
 
 a proper part of the judicial function,
 
 Sylvania,
 
 433 U.S. at 57 n. 27, 97 S.Ct. at 2561 n. 27, the Second Circuit held: “Unless we are to conclude that an anti-competitive impact on intrabrand competition cannot alone support a finding that § 1 [of the Sherman Act] has been violated ... we must conclude [that such a violation has been proven here].”
 
 Id.
 

 We note that the Sixth and Third Circuits, respectively, agree with the Second Circuit that intrabrand competition alone can be a significant concern of antitrust law, notwithstanding the
 
 Sylvania
 
 Court’s observation that inter-brand competition is “the primary concern of antitrust law.”
 
 Sylvania,
 
 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 n. 19.
 
 See Com-Tel, Inc. v. DuKane Corp.,
 
 669 F.2d 404, 412 (6th Cir.1982);
 
 Cernuto, Inc.
 
 v.
 
 United Cabinet Corp.,
 
 595 F.2d 164, 166 n. 11 (3d Cir.1979).
 

 [21]
 

 . Indeed, one study indicates that “[t]he variety of justifications, economic and otherwise, which potentially might be offered for imposing intrabrand restraints are almost limitless.”
 
 ABA Monograph, supra,
 
 at 67.
 

 [22]
 

 . The Second Circuit has explicitly rejected this argument, stating “[t]hat a practice is not per se unlawful does not mean it is
 
 per se
 
 lawful.”
 
 Eiberger v. Sony Corp.,
 
 622 F.2d at 1076. Mere invocation of possible pro-competitive purposes will not suffice to legalize a restraint under the rule of reason. See text at 1576
 
 infra.
 

 [23]
 

 . In
 
 National Society of Professional Engineers v. United States,
 
 435 U.S. 679, 690, 98 S.Ct. 1355, 1364, 55 L.Ed.2d 637 (1978), the Supreme Court endorsed a similar approach to plaintiffs’ burden of proof. Under the rule of reason “Unreasonableness ... could be based either (1) on the nature or character of the contracts, or (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices.” (footnote omitted).
 

 [24]
 

 . This allocation of burdens is consistent with our holding in
 
 Kestenbaum v. Falstaff Brewing Corp.,
 
 575 F.2d 564, 571 (5th Cir.1978),
 
 cert. denied,
 
 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979), that “the rule of reason standard hinges the ultimate legality of a restraint on whether the plaintiff has demonstrated an anti-competitive effect which is not offset by a need to achieve a pro-competitive benefit or justification.” (citations omitted).
 

 [25]
 

 . Pitofsky defines airtight territorial or customer allocation as absolute restrictions, where the dealer has exclusive rights with respect to that supplier’s product or service in the designated area of sale. Pitofsky,
 
 supra,
 
 78 Col.L. Rev. at 4 n. 10. He and other commentators have suggested per se treatment for airtight restrictions.
 
 Id.
 
 at 28; Stewart and Roberts,
 
 Viability of the Antitrust Per Se Illegality Rule:
 
 Schwinn
 
 Down, How Many to Go?,
 
 58 Wash.U.L.Q. 727, 758 (1980). We decline to adopt any rule which would ignore the totality of the circumstances present. However, the nature of the intrabrand restraints is a highly relevant factor in rule of reason analysis.
 

 To the extent that intrabrand competition continues after imposition of intrabrand restraints, the effects of the intrabrand restraints on competition may be
 
 de minimis.
 
 Situations in which intrabrand competition continues to be vigorous differ dramatically from those where the effect of the intrabrand restraint is to shut off all intrabrand competition.
 
 See, e.g., Muenster Butane,
 
 651 F.2d at 298 (defendant’s efforts to restrict intrabrand competition largely ineffectual, intrabrand competition continued unabated);
 
 H & B Equipment Co.,
 
 577 F.2d at 246 (“Rivalry from [the supplier’s other dealers in the relevant market] makes this situation far different from the exclusive territorial arrangements which introduced the intrabrand competition concept into antitrust law.”)
 

 [26]
 

 . Moreover, as we discuss at note 30
 
 infra,
 
 total suppression of intrabrand competition may not be reasonably necessary to achieve any legitimate pro-competitive purpose of the restrictions which may exist. If so, questions may be raised about the real intent of the manufacturer in imposing them.
 

 [27]
 

 . The record reflects that following this incident, Itek’s sales manager for special accounts wrote GPD warning it that it was “necessary and indeed vital” that GPD observe its territorial boundaries. The letter cautioned that an effective relationship required that each organization respect the other’s boundaries.
 

 [28]
 

 . Our independent review of GPD’s customer invoices indicates that GPD’s hourly service charge varied from $19.00 to $26.50. Itek did not bring this out in cross-examination, nor did it contest the general point that GPD charged
 
 *1575
 
 significantly less for service than Itek did. It did challenge one specific example that Zatzos gave of a lower service charge but, as indicated, did not challenge his general point.
 

 [29]
 

 . There was also evidence indicating that GPD’s presence in the Atlanta market would have contributed to competition as to the conditions and terms under which retail customers would be extended credit in making purchases.
 

 [30]
 

 . The record simply does not support Itek’s contention that since it could eliminate its independent distributors by vertical integration and impose territorial restrictions on its own employees, its dual distribution system with territorial restrictions cannot constitute an unrea
 
 *1577
 
 sonable restraint on trade. The record demonstrates that Itek used independent distributors because vertical integration was simply not economically feasible in the secondary markets to which the distributors were assigned; only distributors who could spread their costs over Itek and non-Itek products, like GPD, could survive as economic entities. For a discussion of other reasons why a supplier will prefer independent distributors over vertical integration, see Preston,
 
 supra,
 
 30 Law & Contemp.Probs. at 512.
 

 Much of Itek’s argument to this court is devoted to a misplaced defense of its use of independent distributors, or what it calls its “expanded distribution system.” The distributional efficiencies achieved by resort to independent distributors over vertical integration are clear, and are not challenged by GPD here. What is challenged are the territorial restrictions placed upon those distributors by Itek. The effects of those restrictions on competition, and the relation of those restrictions to any legitimate pro-competitive purpose Itek may have had, are the relevant issues.
 

 [31]
 

 . In the only case in which the Supreme Court has been called upon to apply the rule of reason to vertical restraints, the Court considered whether the restraints were “reasonably necessary to meet the competitive problems posed by [Schwinn’s] more powerful competitors.”
 
 Schwinn,
 
 388 U.S. at 380-81, 87 S.Ct. at 1866. See
 
 also White Motor Co. v. United States,
 
 372 U.S. 253, 270, 83 S.Ct. 696, 705, 9 L.Ed.2d 738 (1963) (Brennan, J., concurring) (“Another issue ... is whether ... [the] operation [of these territorial restrictions] is reasonably related to the needs which brought them into being.”)
 

 We agree with Professor Areeda that nothing in
 
 Syivania
 
 indicates that inquiry whether the restraint is reasonably necessary to accomplish the manufacturer’s legitimate business purposes is not an integral part of the rule of reason. As Professor Areeda states,
 

 the Court’s failure to make anything turn on [Syivania’s] choice of the less restrictive limitation does not imply indifference to the relative severity of related restraints. Rather, the Court decided that such difference was an insufficient basis for a per se condemnation of one while allowing the other.... But the Supreme Court itself did not decide the reasonableness of the restraint before it.
 

 Areeda,
 
 The “Rule of Reason” in Antitrust Analysis: General Issues
 
 9 (Federal Judicial Center Monograph 1981). We note that this interpretation is supported by the district court’s decision on remand in
 
 Syivania,
 
 which upheld the restraints in part because it was one of the less restrictive methods
 
 Syivania
 
 might have used to strengthen its market position. 461 F.Supp. 1046, 1052 (N.D.Cal.1978).
 

 The Former Fifth Circuit implicitly endorsed a reasonably necessary test when it stated “the evil of territorial allocation is the restriction on the distributor’s ability to sell
 
 outside
 
 his territory. Requiring a dealer to provide adequate service
 
 inside
 
 a territory does not injure competition.”
 
 Kestenbaum,
 
 575 F.2d at 572-73 (emphasis in original). Numerous courts have explicitly endorsed the reasonably necessary test,
 
 see, e.g., Donald B. Rice Tire Co.,
 
 483 F.Supp. at 758 (citing cases);
 
 American Motor Inns, Inc. v. Holiday Inns, Inc.,
 
 521 F.2d 1230, 1248-49 (3d Cir.1975) (citing cases), as have commentators,
 
 see, e.g.,
 
 ABA Monograph,
 
 supra,
 
 at 57-58. We agree that the reasonably necessary standard helps to illuminate both the manufacturer’s motive in imposing the restrictions and the effects of the restriction on competition overall. Itek’s failure to show that the abolition of intrabrand competition was reasonably necessary to achieve its legitimate, competitive purposes is thus of considerable importance to our analysis. For a discussion of other techniques available to a supplier to achieve the purposes Itek sought here,
 
 see
 
 Pitofsky,
 
 supra,
 
 78 Col.L.Rev. at 4-5.
 

 [32]
 

 . Nor was there any evidence indicating the existence of, or potential for, a free-rider problem requiring territorial restrictions to ensure such service.
 

 [33]
 

 . Using spatial location market theory, Professor Preston has persuasively demonstrated how territorial restrictions on distributors can increase market penetration by enhancing the depth of market coverage. Preston,
 
 supra,
 
 30 Law. & Contemp.Probs. at 512-19. We do not dispute this theory or its possible application to a system of territorial restraints; however, Itek presented no proof whatsoever linking its restrictions — as opposed to its use of independent distributors — to depth of market coverage.
 

 [34]
 

 . Itek’s other contention regarding liability— that the jury instructions misstated the applicable law — lacks merit. The court’s instructions did not limit the jury’s attention solely to in-trabrand competition. The court told the jury that plaintiff must prove that the territorial restrictions attacked had an anticompetitive effect which was not offset by a need to achieve a pro-competitive benefit or justification. It also explicitly informed the jury that, in determining the effect on competition in the totality, it must consider both intrabrand and inter-brand effects. We have already discussed Itek’s argument that the elimination of intrab-rand competition can never suffice to show that a restraint is anticompetitive. See note 19
 
 supra.
 
 There was no error in these instructions.
 

 [35]
 

 . Any such contention would be frivolous. Itek did not dispute Zatzos’ testimony that GPD’s sales decreased by $155,000 in the year following Itek’s termination of GPD’s distributorship. We have previously held identical evidence — a significant decline in gross sales in the year following termination of a distributorship — to be sufficient evidence of causation of antitrust injury in fact.
 
 Greene v. General Foods Corp.,
 
 517 F.2d 635, 665 (5th Cir.1975),
 
 cert. denied,
 
 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976).
 

 [36]
 

 . We emphasize the posture of the case, see text, at 1566
 
 supra,
 
 because once a plaintiff establishes the fact of damage, as GPD did here, “a directed verdict against that plaintiff on the amount of damages is proper only in the most unusual circumstances.”
 
 Malcolm v. Marathon Oil Co.,
 
 642 F.2d 845, 858 (5th Cir.),
 
 *1580
 

 cert. denied,
 
 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981).
 

 [37]
 

 . Proof of the diminution in the going concern value of a business is ascertainable by comparing the fair market value of the business before and after the antitrust violation.
 
 See Pollock & Riley, Inc. v. Pearl Brewing Co.,
 
 498 F.2d 1240, 1245 (5th Cir.1974),
 
 cert. denied,
 
 420 U.S. 992, 95 S.Ct. 1427, 43 L.Ed.2d 673 (1975). Testimony of business appraisal experts as to what a hypothetical willing buyer would pay a hypothetical willing seller on the open market would be one method of establishing loss in going concern value.
 

 [38]
 

 . With respect to lost future profits, we note that when damages must be assessed to approximate lost future profits, a court and jury necessarily enter the realm of the imprecise and uncertain.
 
 Lehrman v. Gulf Oil Corp.,
 
 464 F.2d 26, 45 (5th Cir.),
 
 cert. denied,
 
 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972).
 
 (Lehrman
 
 I). We have held that it is therefore particularly appropriate to apply the less rigorous standard of proof discussed
 
 supra,
 
 at 1578-1579.
 
 See Malcolm v. Marathon Oil,
 
 642 F.2d at 864.
 

 [39]
 

 . These financial statements — albeit undoubtedly susceptible to strong challenge via cross-examination or contrary testimony, neither of which was forthcoming from Itek at trial— were not on their face of such a nature as to require an expert to assist the jury in understanding them. We have previously held that an expert’s testimony is not necessary to measure damages based on past sales and profit margins.
 
 Malcolm v. Marathon Oil,
 
 642 F.2d at 858. If, in a given case, a person of ordinary intelligence could analyze the documentary evidence in light of sound instructions, an expert will not be required.
 
 Cf. William H. Rankin Co. v. Associated Bill Posters,
 
 42 F.2d 152, 156 (2d Cir.1930) (“The financial history of the [plaintiffs] business was in the case. Perhaps the jury was not as competent to analyze that evidence as some financial and business expert might have been, but it could draw its own reasonable conclusion from it.... The jury had the data before it, and was left to determine the damages from that in what may be called its raw state. Perhaps the testimony of someone competent to have estimated the business loss resulting from the defendants’ acts would have helped, but it was not indispensable.”)
 

 In this case, we have an accountant’s compilation or recapitulation statement of GPD’s financial position in the form of net profits. It characterized that position in language clearly conforming to the relevant measure of damages. Since it had probative value, the adversary process determined its weight. See note 40
 
 infra.
 

 [40]
 

 . The following table summarizes this data: Net Profit or (Loss):
 

 Year Ended December 31, 1975 ($ 4,531.62)
 

 Quarter Ended March 31, 1976 8,440.98
 

 Quarter Ended June 30, 1976 ( 847.61)
 

 Quarter Ended September 30, 1976 ( 5,325.62)
 

 Year Ended December 31, 1976 ( 10,684.82)
 

 Year Ended December 31, 1977 ( 26,238.21)
 

 [41]
 

 . We cannot emphasize too strongly that we do not have before us for review a challenge to the court’s instructions to the jury on damages. Itek did not challenge them at trial, and thereby waived its right to assign them as error on appeal. Fed.R.Civ.P. 51. We do not condone, however, the district court’s failure to distinguish between net and gross profits in its charge. We note, though, that GPD’s proposed charges contained such a distinction, a distinction more favorable to Itek than to it under the circumstances. Itek did not request an alternative charge. The court inexplicably omitted to give GPD’s charge. For an instruction containing this important distinction,
 
 see Lehrman I,
 
 464 F.2d at 44 n. 14.
 

 We must also stress that the parties have not provided us with the closing arguments of counsel. Therefore, we do not know how they urged the jury to calculate damages and are not in a position to determine how it arrived at its figure of $200,000. Finally, we underscore the essential role of the adversary process in determining the weight and reliability of the proof of damages. The jury as factfinder, assisted by counsel, must judge the credibility of witnesses, resolve conflicting evidence and claims, and assess the weight to be given damages testimony.
 
 Lehrman II,
 
 500 F.2d at 668;
 
 Terrell v. Household Goods Carriers Bureau,
 
 494 F.2d 16, 24 (5th Cir.),
 
 cert. dismissed,
 
 419 U.S. 987, 95 S.Ct. 246, 42 L.Ed.2d 260 (1974);
 
 Hobart Brothers v. Malcolm T. Gilliland, Inc., 471
 
 F.2d 894, 903 (5th Cir.),
 
 cert. denied,
 
 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973).
 

 [42]
 

 . Zatzos’ testimony about the age and health of Itek’s principals, coupled with their desire to remain in business, sufficed to allow the jury to estimate the duration of future profits.
 
 Malcolm v. Marathon Oil,
 
 642 F.2d at 864;
 
 Lehrman II,
 
 500 F.2d at 670-71. “The duration of
 
 *1583
 
 the period during which the plaintiff might be expected to profit ... is susceptible of no precise formulation, and must be left to the processes of the jury informed by the presentation of conflicting evidence.”
 
 Lehrman I,
 
 464 F.2d at 47. Itek presented no such conflicting evidence, on this or any other point pertaining to GPD’s damages.
 

 [43]
 

 . The burden of showing that GPD failed to minimize its damages rested with Itek.
 
 Malcolm v. Marathon Oil,
 
 642 F.2d at 863 (citing cases).