Venita THERRELL, Alexandria Thacker, Grace Tate Peterson, Plaintiffs–Appellants,

v.

GEORGIA MARBLE HOLDINGS CORPORATION, Walter Industries, Inc. dba The Georgia Marble Company, Jim Walter Corporation, Defendants–Appellees.

No. 91–8351.

United States Court of Appeals, Eleventh Circuit.

May 13, 1992.

---

* *See* Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

Hugh C. Wood, Dwight A. Meredith, Wood & Meredith, Decatur, Ga., for plaintiffs-appellants.

Gary W. Hatch, Ragsdale Beals Hooper & Seigler, John D. Jones, Greene, Buckley, Jones & McQueen, Terrill L. Mallory, Jones Day Reavis & Pogue, Atlanta, Ga., for defendants-appellees.

Before KRAVITCH, ANDERSON and BIRCH, Circuit Judges.

KRAVITCH, Circuit Judge:

Venita Therrell, Alexandria Thacker, and Grace Tate Peterson (collectively, "the Tate heirs"[1]) brought a diversity action in federal district court against Georgia Marble Holdings Corporation, Walter Industries, Inc. d/b/a The Georgia Marble Company, and Jim Walter Corporation[2] (collectively, "Georgia Marble"). Plaintiffs, who are fractional heirs to certain mineral interests in land mined by Georgia Marble, charged defendants with, inter alia, conversion of marble at a site known as Cove Mountain and conversion and breach of contract at a site known as Tate Quarries, with respect to which plaintiffs also brought an equitable claim for an accounting. The district court granted a directed verdict for defendants on all the Tate Quarries claims. On the Cove Mountain conversion claim, a special verdict by the jury determined that the material mined at the Cove Mountain site was marble, the mineral in which the Tate heirs held an interest, and the court awarded damages to the Tate heirs. The court also ruled, however, that Georgia's statute of limitations limited their recovery to conversion that occurred within four years of bringing the suit. The Tate heirs appeal from the court's statute of limitations ruling on the Cove Mountain claim and the court's directed verdict on the Tate Quarries equitable accounting claim. We affirm in part, reverse in part, and remand the case to the district court for a new trial on the equitable accounting issue.

BACKGROUND

I. Cove Mountain

Plaintiffs-appellants are heirs of S.C. Tate, who died in 1901. Pursuant to the terms of a mineral lease entered into by Tate in 1869, Cove Mountain marble rights reverted to Tate and his heirs. Plaintiffs have held fractional interests in the marble mined from Cove Mountain, but have held no interest in other minerals mined from Cove Mountain.

In 1961, Georgia Marble began to mine at Cove Mountain. The company entered into a mineral lease with third parties who owned the other mineral interests in Cove Mountain, paying them royalties for dolomitic limestone, also referred to as dolomite. Dolomitic limestone, a much less valuable mineral than marble, is similar to marble in certain respects. Because scientific, commercial, and popular definitions of marble differ, opinions can vary on whether a particular mineral deposit is marble or dolomitic limestone. Plaintiffs brought this action in 1988, claiming that the material that had been mined from Cove Mountain was marble, not dolomitic limestone, and that Georgia Marble had been paying the wrong people.

Alexander Therrell ("Therrell") is the son of plaintiff Venita Therrell and the nephew of plaintiff Alexandria Thacker. Since 1977, Therrell has held powers of attorney from these two plaintiffs. He organized, investigated, and made preparations for the present action on behalf of the Tate heirs in return for a portion of whatever judgment they received.

In 1977, Therrell was on the Cove Mountain property for a reason unrelated to this litigation when he spotted a mining operation. Aware that the Tate heirs had not received any royalties from mining on the Cove Mountain site, Therrell, after consulting with the Tate heirs, investigated further. Therrell asked Georgia Mining Vice President John Carney ("Carney") why the

---

1. Appellants are designated "the Tate heirs" for the sake of brevity. Other Tate heirs who still hold mineral interests in the sites under dispute did not join the suit.

2. A federal bankruptcy court stayed proceedings against Jim Walter Corp., which is not involved in this appeal.

Tate heirs were not receiving royalties from this mining activity. Carney replied that the minerals being mined were dolomitic limestone, not marble. Relying on this information, Therrell reported this conversation to the Tate heirs and made no further inquiries until 1981, when he once more approached Georgia Marble and the company again stated that the material at Cove Mountain was dolomitic limestone.

In 1987, Therrell entered on to the Cove Mountain property and obtained a sample of the mineral being mined there. Therrell brought the sample to a geologist, who informed him that the material was marble.

The Tate heirs filed this action in the United States District Court for the Northern District of Georgia. They brought several claims related to the Cove Mountain site, including conversion, RICO, and fraud. Before the case went to the jury, the Tate heirs dropped all of their Cove Mountain claims except for conversion. The conversion claim turned on whether the minerals mined from Cove Mountain were marble, as plaintiffs claimed, or dolomitic limestone, as defendants claimed. At the close of the case, the court submitted three special interrogatories to the jury. The first special interrogatory read: "Were the stone materials removed from Cove Mountain 'marble' as the contracting parties understood and used that term in the documents of 1869, which reserved a 'marble' interest in the property?" The jury said yes.[3]

The district court, without objection from the parties, reserved from the jury the question of what statute of limitations to apply to the claim. After requesting and receiving briefs from both parties on this issue, the court ruled that Georgia's general four-year statute of limitations for conversion applied, limiting the Tate heirs' recovery to the four years preceding the filing of this action. Without the imposition of the statute of limitations, the Tate heirs would have been entitled to damages of roughly $986,000. Instead, they received roughly $82,000.

## II. *Tate Quarries*

The Tate heirs and Georgia Marble were tenants in common at the Tate Quarries site. Pursuant to a lease between the parties that was executed in 1955 and was in effect from 1959 to 1984, Georgia Marble paid the Tate heirs for their fractional interests in three different grades of marble taken from the site. Under the 1955 lease, plaintiffs received $.15 per cubic foot of dimension stone, $.45 per ton for split-face ashlar, and $.05 per ton for "dump block." During this period, Georgia Marble sent quarterly royalty statements to each of the Tate heirs detailing the quantity of marble that had been mined. After the lease expired in 1984, Georgia Marble and the Tate heirs did not negotiate a new lease. Exercising its rights as cotenant in common, Georgia Marble continued to mine at the Tate Quarries site. Georgia Marble continued to pay the Tate heirs at the rates specified in the lease. According to the company, it assured the Tate heirs that once a new lease was signed, they would retroactively receive the difference between the rates they were then receiving and the rates yet to be negotiated.

Plaintiffs claimed that defendants had, during the entire time that they had mined at Tate Quarries, underreported the quantity of marble removed from the site. During the period that the lease was in effect, the parties' rights were defined by the lease. After the lease expired in 1984, the parties' rights were defined by the fact that they were tenants in common. Plaintiffs charged defendants with, *inter alia*, conversion and breach of contract. Plaintiffs, also alleging that defendants had not paid them the full value of the marble after the lease had expired, brought a claim for an equitable accounting.

Plaintiffs' expert witness on the quantity and value of the marble mined at Tate

---

**3.** The second and third special interrogatories concerned the valuation of the marble for different periods of time. The defendants had asserted that certain of the plaintiffs were parties in interest for only certain periods of time. These special interrogatories tracked the periods of time in question.

Quarries and the alleged underreporting by Georgia Marble was Dr. Henry McCarl ("Dr. McCarl"). The substance of plaintiffs' underreporting claims was a comparison between the quantity of marble listed in the quarterly royalty statements that Georgia Marble sent to plaintiffs and the quantity of marble listed in voluntary yearly reports that Georgia Marble sent to the United States Bureau of Mines ("USBM"). Plaintiffs' contention was that Georgia Marble had reported greater quantities to the USBM than to them, and that this proved that defendants had underreported to plaintiffs the amount of marble removed from Tate Quarries.

Dr. McCarl prepared a chart that included columns showing, year by year, the quantity listed in the royalty statements and the quantity listed in the USBM reports. Comparing the two columns, Dr. McCarl arrived at a figure purporting to represent the quantity of marble for which Georgia Marble allegedly had failed to pay the Tate heirs. Cross-examination of Dr. McCarl brought out a number of significant facts, however. First, many of the USBM reports were estimates that did not reflect the actual quantity mined in a particular year. Second, for certain years, no USBM report was prepared at all. Third, defendants brought to light errors in computation committed by the USBM in translating Georgia Marble's report from the units of measurement used by Georgia Marble to the units of measurement used by the USBM, eliciting testimony from Dr. McCarl that he had not checked whether the USBM's mathematical calculations were correct. In light of these and other facts, defendants elicited from Dr. McCarl the admission that he could not state that the royalty statements sent by Georgia Marble to the Tate heirs were inaccurate because he could not state that the USBM reports, on which the underreporting claim was based, were themselves accurate. Finally, it came to light during cross-examination that sixteen quarterly royalty statements from the years in question were missing, but Dr. McCarl had not reflected this fact in his chart. This resulted in Georgia Marble erroneously not being credited for marble that it had reported to plaintiffs.

After it was discovered that plaintiffs' expert witness had been using incomplete records, the court allowed plaintiffs and the witness to create a new chart that used only complete data. The new chart included only those years in which complete data were available. Out of the twenty-nine years originally involved in the underreporting claim, the new chart included only seven years, which, moreover, were nonconsecutive. In some of these years, Georgia Marble actually reported greater quantities of marble to the Tate heirs than it reported to the USBM. Because plaintiffs' information did not cover the continuous period of time covered in their complaint, it was impossible to determine the amount of underreporting or even whether there was underreporting at all. Further, plaintiffs could not show that the USBM estimates were accurate descriptions of the actual quantity of marble mined by Georgia Marble.

At the close of plaintiffs' case, the district court directed a verdict in favor of defendants with respect to all the Tate Quarries claims. The district court stated:

I have a hard time with how the Tate matter can survive from several standpoints. One is: The years are not there. The testimony is such you cannot determine what's in inventory and what isn't in inventory.... There are enough gaps in years that it's like proving a, quote, net worth income tax case.... [T]here's no way one can survive in a net worth income tax case unless you take a beginning year and establish a beginning balance and you conclude it. If you've got any gaps in any of the years between that, your case fails. And you've got gaps, by the witness's testimony this morning. You've got gaps in the years '73, '74, and '75 and then you've got gaps in the years '82, '84, '86.... And when you're dealing with the continuity of accounting such as in a net worth income tax case—and this has similarities to a net worth—when you've got a continuing inventory and a continuing

operation, you have to show what happens in every year or it's meaningless. So, I have a rough time with seeing that there's enough to allow the Tate Quarr[ies] issue to ever get to a jury. R–11 at 141–42. Although the district court directed a verdict on all the Tate Quarries claims, it did not state its reasons for directing a verdict on the equitable accounting claim in particular.

As well as testifying about quantity, Dr. McCarl also testified about the value of the marble at the Tate Quarries site. The USBM reports prepared by Georgia Marble contained an estimate of the value of the marble, F.O.B. shipping point, that the company sold in a given year. "F.O.B. shipping point" describes the value of the marble after it has been mined and processed. Dr. McCarl testified that in his experience in the mining industry it was an acceptable practice to negotiate a royalty arrangement whereby the owners of the mineral interests would receive ten percent of the price of the mined and processed mineral. Because the Tate heirs were still being paid at rates set in the expired 1955 lease, they were receiving far less than ten percent of the value of the marble, F.O.B. shipping point. On cross-examination, defendants challenged the relevance of Dr. McCarl's experience because he was not aware of royalty arrangements involving the types of marble products produced at Tate Quarries or the types of mineral leases entered into in the North Georgia area. Because the district court granted a directed verdict at the close of plaintiffs' evidence, defendants never presented their own evidence of the value of the marble.

On appeal, the Tate heirs do not challenge the district court's grant of a directed verdict on their claims that Georgia Marble had underreported to them the quantity of marble mined at Tate Quarries. They appeal only from the directed verdict on their claim for an equitable accounting, which, they contend, unlike the other claims, did not depend on proof of underreporting of quantity, but on the fact that after the lease expired in 1984, Georgia Marble continued to pay them according to the 1955 lease; they thus claim that they

have not been receiving their fair share of the profits from the property on which they and Georgia Marble were tenants in common.

## DISCUSSION

### I.  *Cove Mountain Site: Statute of Limitations*

■ After the jury determined by special interrogatory that the material mined at Cove Mountain was marble, the district court accepted briefs from the parties on the statute of limitations issue. Under Georgia law, "[a]ctions for the recovery of personal property, or for damages for the conversion or destruction of the same, shall be brought within four years after the right of action *accrues.*" Ga.Code Ann. § 9–3–32 (Michie 1982) (emphasis added). "Generally, in a tort action the statute of limitations begins to run when damage from the tortious act is actually sustained." *Hunt v. Star Photo Finishing Co.,* 115 Ga.App. 1, 153 S.E.2d 602, 605 (1967). In a conversion action, the cause of action accrues on the date of the conversion. *See Harper v. Jones,* 103 Ga.App. 40, 118 S.E.2d 279, 280 (1961). Therefore, the general statute of limitations rule bars plaintiffs from recovery for all conversion that occurred more than four years before the filing of the complaint.

Appellants argue that (1) the district court should have applied the "discovery rule," under which the statute of limitations begins to run when the cause of action is discovered rather than when the tortious conduct occurs, or that (2) if the discovery rule does not apply, that the district court erred in failing to find that fraud involving moral turpitude by Georgia Marble had tolled the statute of limitations.

### A.  *Discovery Rule*

■ Appellants claim that they did not discover the conversion until 1987, which would entitle them to full recovery if the discovery rule were applied. They argue that there is no Georgia law on when a claim of subterranean conversion accrues and that the district court should have fol-

lowed the case law of other mining states and applied the discovery rule. Appellees contend that under Georgia law it is clear that the discovery rule applies only to cases involving personal injury that develops over an extended period of time. We review *de novo* a district court's determination of law, according deference in a diversity case to a district court's interpretation of the law of the state in which it sits. *See Abbott v. Williams*, 888 F.2d 1550, 1553 (11th Cir.1989). We find that the district court chose the correct statute of limitations rule.

Under the discovery rule, the statute of limitations begins to run only when the cause of action is discovered. If the discovery rule applies, plaintiffs will be able to recover for all the conversion that took place, all the way back to 1961. If the discovery rule does not apply, plaintiffs will be able to recover only for the conversion that occurred within four years of the bringing of this suit. The district court ruled that the discovery rule is not applicable and limited plaintiffs' recovery to roughly $82,000 instead of roughly $986,000.

Appellants contend that the discovery rule is the majority rule in mining states and, in the absence of Georgia law on subterranean conversion, should be followed. Appellants quote the Pennsylvania Supreme Court, which explained the rationale for applying the discovery rule in underground cases:

> The owner of land may be present by himself or his servants on the surface of his possessions, no matter how extensive they may be. He is for that reason held to be constructively present wherever his title extends. He cannot be present in the interior of the earth. No amount of vigilance will enable him to detect the approach of a trespasser who may be working his way through the coal seams underlying adjoining lands. His senses cannot inform him of the encroachment by such trespasser upon the coal that is hidden in the rocks under his feet. He cannot reasonably be held to be constructively present where his presence is, in the nature of things, impossible. He must learn of such a trespass by other means than such as are within his own control, and, until these come within his reach, he is necessarily ignorant of his loss. He cannot reasonably be required to act until knowledge that action is needed is possible to him.

*Lewey v. H.C. Frick Coke Co.*, 166 Pa. 536, 31 A. 261, 263–64 (1895).

■ Whether or why the discovery rule is generally applied in other mining states is not relevant, however, because the Georgia Supreme Court has unambiguously limited the application of the discovery rule. With the exception of cases involving personal injury that develops over an extended period of time, Georgia does not apply the discovery rule. In *Corporation of Mercer University v. National Gypsum Co.*, 258 Ga. 365, 368 S.E.2d 732 (1988), *cert. denied*, 493 U.S. 965, 110 S.Ct. 408, 107 L.Ed.2d 374 (1989), the Georgia Supreme Court answered the following question that had been certified by the Eleventh Circuit: "Whether the discovery rule is applicable to property damage cases where there is no applicable statute of repose but there are knowledge and concealment of hazardous defects?" The Georgia Supreme Court answered no, finding that the discovery rule did not apply to property damage claims, even though the plaintiff had complained that the defendant had physically concealed asbestos contamination of the plaintiff's property so that the contamination could not easily be discovered. The *Mercer* court overruled its previous plurality opinion in *Lumbermen's Mutual Casualty Co. v. Pattillo Construction Co.*, 254 Ga. 461, 330 S.E.2d 344 (1985), in which the court had applied the discovery rule to a property damage case in which a latent design defect had caused the plaintiff's building to collapse.

Appellants attempt to distinguish *Mercer* from the instant case by pointing out that this case involves conversion, not property damage. A distinction between conversion and property damage is not relevant to the *Mercer* court's reasoning, however. The court's ruling was based on a distinction between injury to persons and injury to

property. The court, expressly adopting the dissenting opinion of Justice Weltner in *Lumbermen's*, stated that " 'the discovery rule of *King v. Seitzingers, Inc.*, 160 Ga. App. 318 [287 S.E.2d 252] (1981) [is confined] to cases of bodily injury which develop over an extended period of time.' " *Mercer*, 258 Ga. at 365, 368 S.E.2d at 733 (quoting *Lumbermen's*, 330 S.E.2d at 348 (Weltner, J., dissenting) (bracketed material in original)).

*Mercer's* holding was not limited, as appellants claim, to excluding property damage claims from the scope of the discovery rule. In *Miles v. Ashland Chemical Co.*, 261 Ga. 726, 410 S.E.2d 290, 293 (1991), the Georgia Supreme Court explained that in *Mercer*:

> [t]his Court decided that a wholesale use of the discovery rule each time we encountered a statute with the term "accrued" was unwarranted. We held that the discovery rule should be confined to cases in which "bodily injury" develops over an extended period of time. *Implicit in our decision was our recognition that greater protection is required in cases involving death and personal injury than in cases involving mere property damage.*

(Emphasis added.) The court's holdings thus indicate that cases of subterranean conversion are covered by the normal statute of limitations rule for conversion, under which a claim accrues when the damage from the tortious act is actually sustained. *See Harper*, 118 S.E.2d at 280.

### B. *Whether Fraud Tolled the Statute of Limitations*

The Tate heirs next argue that, even if the discovery rule is not applicable, Georgia Marble committed fraud in intentionally concealing the conversion at the Cove Mountain site and that this fraud tolled the statute of limitations. According to Ga. Code Ann. § 9-3-96 (Michie 1982):

> If the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run from the time of the plaintiff's discovery of the fraud.

Under Georgia law, for fraud to toll the statute of limitations, it must involve moral turpitude and must have been designed to deter or debar the plaintiff from filing suit. *See Riddle v. Driebe*, 153 Ga.App. 276, 265 S.E.2d 92, 95 (1980). The Tate heirs claim that Georgia Marble committed such fraud by representing to them that it was mining dolomitic limestone while representing to others that it was mining marble.

### 1. *Standard of Review*

Whether fraud involving moral turpitude tolls the statute of limitations is a mixed question of law and fact that is for the jury to decide. *See Brown v. Brown*, 209 Ga. 620, 75 S.E.2d 13, 17 (1953). The district court, however, did not send this question to the jury among the special interrogatories. Instead, the district court reserved the question and, after entertaining briefs by both sides on the issue, ruled that Georgia Marble had not committed fraud involving moral turpitude and that the statute of limitations had thus not been tolled. Neither party objected to the district court's failure to include the statute of limitations question among the special interrogatories sent to the jury, nor did either party propose that this issue be sent to the jury.

Appellants claim that because the district court decided a jury question, the court in effect entered a directed verdict in favor of defendants and that the ruling should be reviewed to determine whether a reasonable jury could have found that defendants had committed fraud that tolled the statute of limitations. They also argue that defendants waived their statute of limitations defense by failing to propose that a special interrogatory on the issue go to the jury. Appellees contend that the district court did not rule on the fraud question at all. They argue that when plaintiffs dropped all the substantive claims involving fraud before the case went to the jury, leaving only the conversion claim, plaintiffs waived their argument that fraud tolled the statute of limitations. We disagree with both parties.

■ First, according to Fed.R.Civ.P. 49(a), when a district court, in its discretion, employs special interrogatories:

[i]f in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without such demand the court may make a finding....

Neither party demanded that the statute of limitations issue be presented to the jury. They therefore consented to the court acting as trier of fact on this issue, and the court ruled on the issue as a trier of fact; it did not issue the equivalent of a directed verdict. *See Graphic Prods. Distribs. v. Itek Corp.*, 717 F.2d 1560, 1569 (11th Cir.1983).

■ Second, with respect to appellees' contention that plaintiffs had waived their tolling fraud argument, in *Shipman v. Horizon Corp.*, 245 Ga. 808, 267 S.E.2d 244, 246 (1980), the Georgia Supreme Court stated that:

[a]ctual fraud which tolls the statute arises in two entirely different circumstances.... The first circumstance is where actual fraud is the gravamen of the action. In such cases the statute of limitations is tolled until the fraud is discovered or by reasonable diligence should have been discovered.... The second circumstance is where the gravamen of the action is other than actual fraud, such as constructive fraud, negligence, breach of contract, etc. In such cases there must be a separate independent actual fraud involving moral turpitude which debars and deters the plaintiff from bringing his action.

Even though the Tate heirs dropped all their independent claims involving fraud, they still had the opportunity, under the second circumstance referred to above, to argue that fraud involving moral turpitude had prevented them from discovering the conversion. Having found that (1) the district court was correct in ruling on the question of whether fraud tolled the statute of limitations and (2) in reserving the

question from the special interrogatories, the district court acted as the trier of fact on the fraud issue, we must determine whether or not the district court's finding was clearly erroneous. *See* Fed.R.Civ.P. 52(a); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 916 (1st Cir.1988) (holding that "there is every reason to treat the district court's Rule 49 findings of fact in the same manner as findings of fact made after a bench trial, reviewable under the 'clearly erroneous' standard of Fed.R.Civ.P. 52(a)"); *Spectra–Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1535 (Fed.Cir.), *cert. denied*, 484 U.S. 954, 108 S.Ct. 346, 98 L.Ed.2d 372 (1987); *Taherzadeh v. Clements*, 781 F.2d 1093, 1100 (5th Cir.1986). We hold that the district court's finding was not clearly erroneous.

### 2. *District Court's Findings of Fact*

The district court, noting that "[i]t is well established under Georgia law that fraud which would relieve a case from the bar of the statute of limitations must be such as involves moral turpitude," found that Georgia Marble had committed no such fraud. *Therrell v. Georgia Marble Holdings Corp.*, No. 2:88–CV–161–WCO, at 5 (N.D.Ga., filed March 30, 1990). Although there are several elements that must be satisfied to establish fraud, the district court focused only on the questions of moral turpitude and whether Georgia Marble attempted to debar the Tate heirs from filing suit.

Fraud involving moral turpitude is actual fraud, not merely constructive fraud. *See Curlee v. Mock Enters., Inc.*, 173 Ga.App. 594, 327 S.E.2d 736, 740 (1985). It "consists in any kind of artifice by which another is deceived.... [It] implies moral guilt...." *See Shipman*, 267 S.E.2d at 245 n. 3.

The district court stated:

The evidence was clear that Georgia Marble was not attempting to commit a fraud upon the plaintiffs or deter them from filing suit. Georgia Marble paid nearly a quarter of a million dollars in marble royalties to the persons whom it believed were entitled to those mineral

rights. Furthermore, there were three court decisions which recognized the distinction between marble and dolomite. The most the evidence showed was that Georgia Marble was mistaken and paid the wrong people for the materials removed from Cove Mountain.

*Therrell, supra,* at 5.

■ The district court found that the fact that Georgia Marble had been aware of and was a party in three cases that recognized a distinction between marble and dolomitic limestone, *see, e.g., Scott v. Georgia Marble Co.,* 356 S.E.2d 29 (Ga. 1987), indicated that the company did not deal in bad faith or have an intent to deceive when it represented the material to the Tate heirs as dolomitic limestone. Further, although it is true that Georgia Marble paid far less to the owners of the other mineral interests at Cove Mountain than it would have paid to the owners of the marble interests, the district court was correct in recognizing that the fact that defendants had openly entered into and honored a lease with third parties who believed themselves to be the rightful owners of the minerals mined from Cove Mountain is also evidence of a lack of bad faith or intent to deceive.

Appellants argue that there was other evidence of fraud involving moral turpitude that the district court failed to give proper weight. First, appellants point out that Georgia Marble sold a product known as "White Magic Marble Chips" that came from the Cove Mountain site. They argue that this indicates that while Georgia Marble was telling the owners of the mineral interests that the material was dolomitic limestone, the company was telling the general public that the material was marble.

Evidence indicated, however, that there have been at least three different definitions of marble in use: the scientific, the commercial, and the public definitions. Evidence was introduced in the case showing that, generally, a scientific definition of marble is a "metamorphic rock consisting predominantly of fine to coarse recrystallized calcite and/or dolomite," R–8 at 186–

87; a commercial definition of marble is a "crystallized corbonate rock, including true marble and certain types of limestone or marble that can take a polish and can be used as architectural or ornamental stone," R–8 at 187; and a public definition of marble is more general. R–12 at 129.

Although the jury determined that the material mined from Cove Mountain was marble as contemplated in the 1869 reservation, the proposition that Georgia Marble honestly considered it to be dolomitic limestone is not undermined by the fact that it sold a material to the public as marble chips. It is not inconsistent for the company to use the commercial definition in one context and the public definition in another context. Likewise, defendants' admission that they operated a marble crushing plant at Cove Mountain does not indicate an intent to deceive. Defendants could have in good faith taken the position that the material was not marble: crushed marble would not be considered marble under the commercial definition because it could not be used for building. We find, therefore, that the district court's determination that Georgia Marble had not committed fraud that tolled the statute of limitations was not clearly erroneous.

II. *Tate Quarries Site: Directed Verdict*

At the close of plaintiffs' evidence, the district court directed a verdict in favor of defendants on all claims concerning the Tate Quarries site. The Tate heirs do not challenge the directed verdict on the claims that depended on their allegations that Georgia Marble underreported to them the quantity of marble mined from Tate Quarries. They appeal only from the directed verdict on the equitable accounting claim, which, to succeed, does not necessarily depend on proof of underreporting of quantity.

The Tate heirs and Georgia Marble were tenants in common at the Tate Quarries site. After the mineral lease expired in 1984, the parties' rights were defined by their relationship as cotenants. Under Georgia law, a cotenant, Georgia Marble, has the right to enter on to and mine the

common property without the consent of its cotenants, the Tate heirs, but that right is subject to its accounting to the other cotenants for their respective shares. *See Slade v. Rudman Resources, Inc.,* 237 Ga. 848, 230 S.E.2d 284, 286 (1976). According to Ga.Code Ann. § 44–6–122 (Michie 1982), entitled "Accounting between cotenants for unequal share of rents or profits," "[i]f one tenant in common receives more than his share of the rents and profits, he shall be liable therefor as the agent or bailee of the other cotenant." It is the Tate heirs' contention that when Georgia Marble continued to pay them at 1955 rates for the marble after the lease expired in 1984, the company was receiving more than its share of profits and the Tate heirs were thus entitled to an accounting.

Although the district court explained its reasoning in directing a verdict on the other Tate Quarries claims, it did not explain why it directed a verdict on the accounting claim. The accounting that plaintiffs prayed for was equitable; the district court, though, informed the parties before trial that all claims would be tried to the jury. Therefore, we review the district court's grant of the directed verdict under the normal standard: Viewing the evidence "in the light and with all reasonable inferences most favorable to the party opposed to the motion[,] [i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion[ ] is proper." *Buckley v. Hospital Corp. of America, Inc.,* 758 F.2d 1525, 1527 (11th Cir.1985) (quoting *Boeing v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc)).

■ Under Georgia law, a court will not order an accounting unless a plaintiff introduces evidence that would allow the factfinder to determine the amount owed. In *Taggart v. Savannah Gas Co.,* 179 Ga. 181, 175 S.E. 491, 492 (1934), the Georgia Supreme Court held that even though "the evidence tended to show that one or two of the devices belonging to the plaintiff had come into the possession of the defendant gas company, and that the company had

not accounted to the plaintiff therefor.... no recovery could be had on this account" because the plaintiff "did not introduce any evidence to show its value."

In *Bowman v. Chapman,* 179 Ga. 49, 175 S.E. 241, 241 (1934), the Georgia Supreme Court stated that:

> [i]n a proceeding to obtain an accounting the complainant is not obliged to show how much is due. But the law will not do a vain thing, and order an accounting, when the petitioner does not aver facts sufficient to indicate that something will be found to be due to him by the defendant.

(quoting *Gould v. Barrow,* 117 Ga. 458, 43 S.E. 702 (1902)). *See also Atlanta Trust Co. v. National Bondholders Corp.,* 188 Ga. 761, 4 S.E.2d 644, 650 (1939) (holding that "[i]n a proceeding to obtain an accounting, the complainant is not obliged to show how much is due, provided he avers facts sufficient to indicate that something will be found to be due him by the defendant").

The Georgia Supreme Court has stated, however, that reliance on the holdings of *Gould* and *Bowman,* as restated in *Atlanta Trust Co.,* for the proposition that a plaintiff need not prove the amount owed to survive a directed verdict:

> is misplaced as that case involved the then current rules of pleading to avoid special demurrer, whereas the present case involves proof of facts to avoid a directed verdict. This court's holding in the *Atlanta Trust Co.* case, supra, that a "complainant is not obliged to show how much is due" must be taken in the context of former rules of pleading and must be understood as an alternative statement of the holding in that case that "The items of the account need not be alleged." 188 Ga. at 770, 4 S.E.2d at 650.

> The rule of proof on trial to avoid directed verdict is different. It is not error to direct a verdict if the evidence and all reasonable deductions therefrom, considered in the light most favorable to the respondent to the motions, *demands*

the verdict and fails to disclose *any* material issue for jury resolution.

*Burney v. Butler*, 243 Ga. 620, 255 S.E.2d 686, 687 (1979) (emphasis in original).

■ It appears, then, that to survive a directed verdict on their accounting claim, plaintiffs had to do more than prove that something is owed them; they had to give the factfinder sufficient information to determine the amount owed without speculation or guesswork. Under Georgia law, "[a] jury must be able to calculate the amount of damages from the data furnished and it cannot be placed in a position where an allowance of loss is based on guesswork. [If] the plaintiff's evidence fails to provide sufficient data to permit a reasonable determination of allowable damages, the trial court [would] not err in directing a verdict on this issue." *General Warranty Corp. v. Cameron–Hogan, Inc.*, 182 Ga.App. 434, 356 S.E.2d 83, 87 (1987) (citations omitted). Although a plaintiff is "not required to prove its damages to the exact dollar, it [is] required to provide some rational basis of computation." *Tri–State Systems, Inc. v. Village Outlet Stores, Inc.*, 135 Ga.App. 81, 217 S.E.2d 399, 403 (1975).

Although, strictly speaking, a claim for an accounting is not the same as a claim for damages, the same principle applies: the factfinder should not be placed in a situation in which there is such a lack of evidence of the amount owed that there is a danger of not merely making plaintiff whole, but putting plaintiff in a better position than if the conduct by defendant that precipitated the complaint had not taken place.

■ Georgia Marble concedes that it and the Tate heirs have been tenants in common. It also asserts that it has always stood willing to give an accounting to the Tate heirs upon a reasonable request. Its sole argument for upholding the district court's directed verdict on the accounting issue is that the Tate heirs failed to present sufficient evidence of (1) the quantity and (2) the value of the marble mined from the Tate Quarries site for a factfinder to determine what is owed them. Appellants argue

that they did not need to rely on the inaccurate and incomplete USBM reports to prove the quantity of the marble. The substance of their equitable accounting claim is that the payment that they have received for the marble since the lease expired is less than their fair share of the profits from the property. Unlike the case with respect to all the other Tate Quarries claims, alleged underreporting of quantity is not an essential element of this claim. Instead, they argue, the jury could have accepted Georgia Marble's own quantity figures, which were reflected either in "pull block sheets" or in the royalty statements themselves, even though plaintiffs had attempted in their other claims to prove that these statements were inaccurate. With respect to value, they argue that the testimony of their expert witness, Dr. McCarl, gave the jury sufficient information.

### A. *Quantity*

Georgia Marble argues that plaintiffs' reliance on the USBM estimates to determine the quantity of marble mined from Tate Quarries was not sufficient to survive a directed verdict motion. The Tate heirs contend that the jury could have used Georgia Marble's "pull block sheets" to determine amount. The pull block sheets, which were introduced into evidence by plaintiffs, are records kept by Georgia Marble of the quantity of marble actually removed from the ground. By the close of plaintiffs' case, however, it was clear that they were not relying on the pull block sheets to prove the quantity of marble mined at Tate Quarries. Their expert testimony on quantity, including explanations of charts prepared by the expert, focused exclusively on the USBM reports. On cross-examination, in fact, Dr. McCarl testified that although he relied on the pull block sheets to determine quantity at the Cove Mountain site, he relied on the USBM reports to determine quantity at the Tate Quarries site. Opposing the motion for a directed verdict before the district court, the Tate heirs did not mention the pull block sheets; rather, they relied on the USBM reports that Dr. McCarl used in his testimony:

Well, what we would ask, your honor, is to hold this directed verdict on the Tate claims to see if defendants can come forward with any proof that the estimations are improper or incorrect. If they have shipment records, inventory records or sales records that will indicate that the estimates on that USBM evidence is incorrect, then at that time I think they are entitled to a directed verdict. But to sit back, not produce the material, force the plaintiffs, who—and we have to understand this is a fiduciary duty. These are people who are co-tenants. They must account for every piece of marble that is processed and shipped to the plants, and what they do is they send a summary sheet.

R–11 at 124–25.

Nevertheless, the pull block sheets were introduced into evidence and the jury could have used them to determine quantity. Further, even if the jury disregarded the Tate heirs' evidence concerning the USBM reports and the pull block sheets, it could have chosen to determine quantity from the royalty statements, which were also introduced into evidence. Again, because the substance of the equitable accounting claim—as distinguished from the other Tate Quarries claims—appears to be the value of the marble, not the quantity, the jury could determine that the quantity reported by defendants to plaintiffs was correct, and could still find that plaintiffs were due an accounting because they were not receiving the fair value for the marble. Therefore, there was sufficient evidence on the quantity issue to escape a directed verdict.

#### B. *Value*

To survive a directed verdict plaintiffs must also be able to show that they re-

ceived less than the fair value of the marble and "provide some rational basis of computation" for the actual value. *Tri–State Systems, Inc.*, 217 S.E.2d at 403. Appellants argue that their evidence of the value of the marble was in two parts. First, USBM reports filed by Georgia Marble established the company's estimate of the value of the marble mined from Tate Quarries, F.O.B. shipping point. Second, plaintiffs' expert witness, Dr. McCarl, testified that, from his experience, an appropriate method for determining the fair value of the marble in the ground was to multiply the value of the processed marble by ten percent. The USBM reports and Dr. McCarl's testimony were the only evidence that plaintiffs introduced as to value.

■ Georgia Marble argues that Dr. McCarl's testimony about value should be given no weight because Dr. McCarl lost all credibility with the court by, *inter alia,* failing to disclose the fact that he was working with incomplete information on the quantity issue. Although it appears that Dr. McCarl did lose credibility with the court,[4] such loss of credibility is not a justification for issuing a directed verdict. Credibility is a matter solely for the jury. "[I]t is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of the witnesses." *Buckley,* 758 F.2d at 1527 (quoting *Boeing,* 411 F.2d at 375).

Dr. McCarl's testimony about the value of the marble was based on the USBM reports, in which Georgia Marble reported its estimates of the amount of marble mined for a particular year, and the value of the marble, F.O.B. shipping point.[5]

---

**4.** After cross-examination disclosed that Dr. McCarl had been working with incomplete information, the district court stated:

Well, the witness is irresponsible if he made this up and testified that this was all of the records, and that's what he had led me to believe throughout his direct examination and led the jury to believe, because it was not until well into his cross-examination that I had any comprehension that there was any period of

time that was not covered in those royalty statements.
R–11 at 24–25.

**5.** The fact that the USBM reports were inaccurate and incomplete with respect to quantity does not mean that they were inaccurate with respect to value. Because Georgia Marble figured its value estimate based on its quantity estimate, the unit-price figure would reflect the company's actual estimate of the marble's value. For example, when Georgia Marble filed its

These USBM estimates indicated the value of the marble after processing.

Dr. McCarl acknowledged that the processing of raw stone products adds a great deal to their market value. He proposed that by multiplying the price of the marble, F.O.B. shipping point, by ten percent (dividing the F.O.B. shipping point price by ten), one would arrive at the fair value of the stone in the ground. For instance, in its 1986 report to the USBM, Georgia Marble estimated that it had mined $460,000 F.O.B. plant worth of mined and processed marble at the Tate Quarries site. Dr. McCarl's ten percent multiplier would give a value of $46,000 to the marble in the ground. Dr. McCarl testified that he drew the multiplier from his experience working at Vulcan Materials Company, which he stated is the largest stone company in the country. He testified that in the 1960s it became an accepted practice to set mineral royalty rates at ten percent of the value of the processed stone.

On cross-examination, Dr. McCarl admitted that the only marble product that he could state had been the subject of a ten-percent royalty contract was terrazzo, a product not produced at Tate Quarries. Plaintiffs did not establish that the marble products that the Tate Quarries site does produce have similar processing costs to terrazzo. Dr. McCarl admitted that he was unaware of any leases in Georgia in which royalties were computed by the method he proposed and that he had never investigated the north Georgia mining business to determine lease pricing practices. Plaintiffs did not present any other evidence of the value of, or prices paid for, unprocessed marble. Further, on cross-examination, Georgia Marble established that mathematical errors contained in the USBM quantity-conversion calculations also affected the USBM figures for value and that Dr. McCarl had not checked the USBM's mathematical calculations to eliminate any errors.

It is a close question whether, based on the expert witness's testimony and the USBM reports, there would be sufficient evidence for a reasonable jury to determine the value of the marble mined at Tate Quarries. The highest price for crushed marble in the 1955 lease is $.45 per ton. Under Dr. McCarl's estimate of value, plaintiffs would receive something closer to $1.50 per ton for crushed marble. Dr. McCarl also testified that the reason that percentage-of-fair-market-value terms in long-term leases became prevalent in the 1960s was that parties became concerned about the rising rate of inflation. Dr. McCarl stated that "by the 1960s, people were recognizing that there was a problem with inflation and that they probably ought to be participating at a percentage of the fair market value, so 10 percent was a reasonable amount assigned to the owners of mineral rights. And we had negotiated those kinds of things with Vulcan on various acquisitions on various properties."

Because the lease between the parties was executed in 1955, Dr. McCarl's testimony about inflation bolsters plaintiffs' argument that, after the lease expired in 1984, they were not receiving their fair share of the profits from the property. Plaintiffs failed to demonstrate that the ten-percent figure has been applied in leases involving the type of marble products produced at Tate Quarries. They did, however, present evidence through Dr. McCarl's testimony that the ten-percent figure had been used for another marble product. When one views the evidence in the light most favorable to the nonmovant, it appears more likely than not that inflation has raised the value of marble above the prices fixed in the 1955 lease and that plaintiffs have carried their burden of proof by "provid[ing] some rational basis of computation" for value. *Tri–State Systems, Inc.,* 217 S.E.2d at 403.

At a new trial, defendants can present their own evidence of the value of the marble. They were unable to do so here

1986 report to the USBM, even if its estimate of 32,800 tons sold was not accurate as to quantity, its estimate that those 32,800 tons of marble had an F.O.B. shipping point value of $460,000 was an accurate representation of value. It demonstrates that the company considered the marble to have an F.O.B. shipping point value of $14.02 per ton.

because the district court granted their motion for a directed verdict at the close of plaintiffs' evidence.

Appellate courts have often emphasized the desirability of withholding judgment on a directed verdict motion until after the jury has returned a verdict, or, certainly, until both sides have presented their cases: "Where there is any doubt at all as to the propriety of a directed verdict, district courts should not jump the gun but should wait until both sides have presented their evidence before ruling on motions for directed verdict." *United States v. Vahlco Corp.*, 720 F.2d 885, 889 (5th Cir.1983). "[T]rial judges are formally encouraged for cogent reasons of judicial economy ordinarily to submit all but the plainest cases for jury verdict subject to the reserved ruling...."
*Colonial Lincoln–Mercury, Inc. v. Musgrave*, 749 F.2d 1092, 1098 n. 3 (4th Cir. 1984).

One leading treatise explains:

Even at the close of all evidence it may be desirable to refrain from directing a verdict though it would be possible to do so. If a verdict is directed and the appellate court holds that the evidence was in fact sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination of the case is greatly expedited. If the jury agrees with the court's appraisal of the evidence, and returns a verdict for the party who moved for a directed verdict, the case is at an end. If the jury brings in a different verdict, the trial court can grant judgment notwithstanding the verdict. Then if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial. For this reason the appellate courts have repeatedly said that it is usually desirable to take a verdict, and then pass on the sufficiency of the evidence on a post-verdict motion.

9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2533, at 586 (1971).

We realize that the district court was well aware that the interests of judicial economy usually make it desirable to reserve judgment on a directed verdict motion and allow the jury to reach a verdict. In this case, the district court rightly concluded that the evidence presented by plaintiffs to establish underreporting of quantity was so insubstantial that judicial economy weighed against wasting resources by forcing defendants to put on any evidence to rebut the claim. It seems, however, that the equitable accounting issue, which, to succeed, did not depend on proof of underreporting of quantity, slipped by the parties and the court and became the baby that was thrown out with the bath water.

We hold that there was sufficient evidence for a reasonable jury to have found that plaintiffs had established the fair value of the marble and that the district court erred in directing a verdict on this claim.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's ruling on the Cove Mountain statute of limitations issues. We REVERSE the district court's directed verdict on the Tate Quarries equitable accounting claim, and REMAND the case to the district court for a new trial on the equitable accounting issue.